[No. S006395. Dec. 17, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
GUY KEVIN ROWLAND, Defendant and Appellant.

**COUNSEL**

Andrew J. Weill, under appointment by the Supreme Court, and Robert Navarro for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Morris Beatus and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On February 11, 1987, the District Attorney of San Mateo County filed an amended information against defendant Guy Kevin Rowland in the superior court of that county. (He had filed the original information on September 29, 1986.)

Count I charged that on or about March 17, 1986, defendant murdered Marion R. (Pen. Code, § 187.)

It was alleged for death eligibility that defendant committed the offense under the special circumstance of felony murder in the course of rape (Pen. Code, § 261). (*Id.*, § 190.2, subd. (a)(17)(iii).)

Count II charged that on or about March 17, 1986, defendant raped Marion R. (Pen. Code, § 261, subd. (2), as amended by Stats. 1985, ch. 283, § 1, pp. 1307-1308, present Pen. Code, § 261, subd. (a)(2).)

It was alleged for enhancement of sentence that on or about June 8, 1981, defendant was convicted in the Superior Court of Alameda County of twelve "serious felonies" (Pen. Code, § 667, subd. (a)): two counts of kidnapping (*id.*, § 207); three counts of rape (*id.*, § 261); three counts of rape in concert (*id.*, §§ 261, 264.1); two counts of sodomy (*id.*, § 286); one count of lewd or lascivious conduct with a child under fourteen years of age (*id.*, § 288, subd. (a)); and one count of oral copulation (*id.*, § 288a).

It was also alleged for enhancement of sentence that defendant served a prison term for each of the 12 offenses listed above. (Pen. Code, § 667.5, subd. (b).)

It was finally alleged for purposes of prohibiting probation or suspension of sentence that defendant committed the charged murder and rape while on state prison parole (Pen. Code, § 3000) following a prison term imposed for the "violent felonies" comprising each of the 12 offenses listed above, with the exception of the 2 kidnapping counts. (*Id.*, § 1203.085, subd. (a).)

Defendant pleaded not guilty to the charges and denied the allegations.

Trial was by jury as to the charges and the special circumstance allegation. With defendant's agreement to bifurcation and waiver of a jury, trial was by

the court as to the other allegations. The jury returned verdicts of guilty against defendant as to murder in the first degree and rape, and also found the special circumstance allegation true. It subsequently returned a verdict of death for the murder. The court rendered a finding of true as to each of the other allegations. It denied the automatic application for modification of the verdict of death. (Pen. Code, § 190.4, subd. (e).) It proceeded to enter judgment as follows. For the murder, it imposed the sentence of death. For the rape, it imposed a sentence of imprisonment comprising the upper term of eight years as to the offense itself, to be served fully, separately, and consecutively to any other sentence, with an additional term of five years for the prior "serious felony" convictions. It stayed the sentence of imprisonment pending execution of the sentence of death.

Finding no reversible error or other defect, we conclude that the judgment must be affirmed.

## I. Facts

### A. *Guilt Phase*

The evidence presented by the People told a tale to the following effect.

About 9 p.m. on March 16, 1986, defendant was introduced to Marion R. at the Wild Idle Bar in the rural community of Byron in Contra Costa County. He was 24 years of age and she was 31. Marion R. was talking with friends "about chickens and eggs and all kinds of things, town things." She was still feeling the effects of a cold she had the previous week and was drinking only moderately. She lived and worked in Byron, residing with her mother and serving as a cook at the Boys' Ranch. She was not known as a "loose woman." All the same, she regularly "snorted" methamphetamine and evidently had a vial of the substance in her possession. Defendant was a stranger from Livermore in neighboring Alameda County. At the bar, he had asked a patron, "[W]here's the chicks in town here[?]" He was told "if he wanted chicks he should go to Walnut Creek or Concord if he's looking for that kind of action."

Defendant socialized with Marion R. for a while. To the eyes of an off-duty bartender, he appeared to be "coming on" to her. She did not respond positively, but seemed to be "trying to ignore" him.

Before 10 p.m., defendant left the bar alone. Apparently, he drove away in a truck he had driven there.

Sometime later, Marion R. told a friend named Jeanne Weems that "she was not feeling very well, she had a terrible headache," and that "she had to

go to work early the next morning and she needed to go home because she had a terrible headache and she needed to get some sleep." (Generally, she set out for work around 5:30 a.m. and went to bed by 11 p.m.) She then left the bar alone. Apparently, she drove away in a car she had driven there. Not long afterwards, the vehicle was seen parked about half a block from the bar in an unusual location and in an unusual way; it was evidently empty; and it was apparently unlocked—a condition inconsistent with Marion R.'s "firmly ingrained" "habit."

In the hours that followed, defendant brutally beat Marion R. about the head and face and elsewhere. He also had sexual intercourse with her, evidently against her will. There was expert testimony that she suffered a bruise "an inch or two above the [right] kneecap and somewhat towards the inside part of the thigh"; the location of the injury was "unusual"; such a bruise, however, could have been caused "if someone used a knee . . . to force the legs apart." Finally, he strangled her. Apparently, he choked her twice: the first time, he did not succeed in killing her; the second time, about 30 to 60 minutes later, he did. Before death, she ingested a potentially lethal dose of methamphetamine. It appears that he may have put the substance into her mouth after he overcame her resistance. It does not appear that she could have "snorted" the requisite quantity of the substance or that she would have attempted to do so voluntarily. He hauled the body in his truck to the vicinity of Half Moon Bay in San Mateo County, dragged it on the ground, and dumped it in the ocean.

About 6 a.m. on March 17, defendant called a woman named Susan Lanet, who lived in Livermore and was apparently his lover, and arranged to visit. Around 7 a.m. he arrived at her house. He seemed disturbed and said he was going to leave the state. They shared some methamphetamine he had evidently taken from Marion R. Later, he again said he was going to leave the state. He soon admitted that he had killed Marion R. He asked Lanet whether she wanted some of the dead woman's belongings, including a ring and makeup. She said no. He offered her $20 to clean his truck and remove "[b]lood and every strand of hair." Frightened, she purported to accept. Her secret intent, however, was to summon the police. She eventually did so. About 9 a.m., an officer of the Livermore Police Department arrested defendant as he attempted to flee. It was later determined that defendant had not consumed a quantity of methamphetamine that would have caused substantial impairment at any time relevant here. Around 9:45 a.m., Marion R.'s body was found lying face down at the base of a cliff in the environs of Moss Beach near Half Moon Bay.

Defendant did not present any evidence. He did not himself take the stand, nor did he call any witnesses.

## B. *Penalty Phase*

To establish the appropriateness of the death penalty, the People offered in aggravation: (1) the circumstances of the offenses defendant committed against Marion R.; (2) other violent criminal activity he perpetrated; and (3) prior felony convictions he suffered.

As to the circumstances of the offenses, the People did not present any evidence. Instead, they relied on the evidence already adduced at the guilt phase.

As to other violent criminal activity, the People presented evidence to the following effect.

On April 4, 1978, defendant unlawfully entered the residence of Harriet Larson in San Ramon in Contra Costa County. Attempting to escape, he assaulted and battered the woman, who was then 63 years of age. She suffered a crushed vertebra and required 11 days of hospitalization.

On October 4, 1980, defendant lured 26-year-old Tereza V. out of a bar in Pleasanton in Alameda County to a nearby park with a false offer to share some cocaine. At the park, he made sexual advances; she rejected his approach; he then assaulted, battered, and raped her; during the attack, she bit off part of his tongue.

On November 7, 1980, together with a male partner, defendant lured Lisa V. and Caren F. into a truck in Fremont in Alameda County with a false offer of a ride; the girls were friends and were then 13 years of age. Defendant and his partner then kidnapped Lisa and Caren. Caren escaped; Lisa attempted to, but failed. Defendant helped his partner rape Lisa twice. He himself raped her six times, caused her to orally copulate him, sodomized her twice, and fondled her genital organs and other parts of her body. During the attack, he repeatedly threatened her with death if she resisted.

On March 11, 1986, defendant engaged in an acrimonious argument with his apparently 20-year-old stepsister Keli Taylor in the home she shared with her mother and stepfather (defendant's father) in Pleasanton. The occasion was a dispute about the locking of a door. The cause, however, was evidently something else: defendant had formerly expressed a romantic interest; Taylor did not respond in a positive fashion, but rather (it seems) with antagonism. In the course of the argument, during which he took up a knife and slammed his fist through the door of Taylor's bedroom, defendant assaulted Taylor and threatened her with death.

On March 11, 1986, defendant was introduced to Patricia G. by Susan Lanet at Lanet's home in Livermore. The trio used some methamphetamine. Later, defendant offered to drive Patricia home and she accepted. Lanet did not go along. Defendant did not take Patricia home. Instead, he drove her to the top of a cliff that loomed over a body of water. During the trip, he had started to beat her. At the cliff, he pulled her out of the car, hit her repeatedly, and pushed her to the ground; he said he was going to kill her and throw her body off the cliff; he told her to take her clothes off or he would rip them off, and she apparently complied; he kept hitting her and then started to choke her; she begged for her life and he relented; although the matter is uncertain, he may have raped her. He then drove her from the cliff to his mother's house. There, he kept her in the bathroom for a time against her will. He also called Lanet and admitted what he had done. Asking Patricia for time to get away before she called the police, he fled.

As to prior felony convictions, the People presented evidence that on June 8, 1981, defendant was convicted in Alameda Superior Court of the following offenses, which arose out of the Lisa V./Caren F. incident: two counts of kidnapping; five counts of rape; three counts of rape in concert; two counts of sodomy; one count of lewd or lascivious conduct with a child under fourteen years of age; and one count of oral copulation.

To establish the appropriateness of life imprisonment without possibility of parole, defendant offered in mitigation his background and character. He presented evidence to the following effect.

Defendant was born into a middle-class family in 1961, with a brother and sister already there and another sister to follow. He is apparently of at least average intelligence. His father and mother had a violent, alcoholic marriage and created a violent, alcoholic home. His mother, especially, subjected him to serious neglect and abuse; indeed, she twice attempted to drown him in his bath when he was a baby. As a toddler, he began to experience "night terrors" and convulsions. Early on, he commenced psychotherapy and drug therapy. In school, he exhibited learning disabilities and behavioral problems. As time passed, he started to abuse alcohol and drugs. He soon came to the attention of the juvenile and later the criminal authorities. He proceeded to spend a substantial period of time in correctional facilities, including the Youth Authority and state prison.

It appears that at various points in his life, defendant was diagnosed with various mental conditions. For example, the earliest finding, when he was six or seven years of age in 1967 or 1968, was apparently hyperactivity. The latest, when he was 26 years of age at time of trial in 1988, was borderline

personality disorder—a "significant major mental illness," a "major psychiatric disorder" that "can be just as disruptive as schizophrenia," a condition wherein the subject "exists or lives out [his] life in this borderline between normality and neuroticism and, also, psychosis." There was expert psychiatric testimony that at the time of the present offenses, defendant was mentally impaired. But there was also evidence showing defendant's interest in psychology and suggesting his manipulation of the testifying psychiatrist.

In spite of all, defendant had shown himself to be kind and helpful to several family members, friends, and acquaintances on several occasions. He had become a so-called "born again" Christian evidently between 1976 and 1980 (although possibly between 1981 and 1984). He knew the difference between right and wrong and could act accordingly. Apparently, he had accepted responsibility for his crimes against Marion R., and felt remorse.

In addition to his own background and character, defendant offered the background and character of members of his family. For example, there was testimony that defendant's father and mother each came from violent, alcoholic homes; that his mother was sexually molested by her father when she was about eleven years of age; that for several years during childhood, his father was a catamite for a neighborhood man who gave him gifts in exchange for his favors; that his (defendant's) mother once put his older sister's head in a gas oven when she was a baby and turned the gas on, but failed to carry through; that his father sexually molested that same sister at seven or eight years of age and later in adolescence; that under the influence of alcohol, his father abused his mother, physically and otherwise; and that under the influence of alcohol and drugs, his brother treated his own wife in like fashion.

Lastly, defendant set out the conditions of confinement for a person sentenced to life imprisonment without possibility of parole. Testimony suggested that he could live a life of some value in prison and would not be dangerous.

In making his case-in-mitigation, defendant himself did not take the stand.

## II. GUILT ISSUES

Defendant raises a number of claims attacking the judgment as to guilt. As will appear, none is meritorious.

### A. Claims Relating to IN LIMINE Motions Concerning "Other Crimes" Evidence

Prior to trial, defendant moved *in limine* to prohibit the People from introducing evidence of prior adjudicated and unadjudicated crimes and

related conduct—including the Tereza V., Lisa V./Caren F., and Patricia G. incidents—in order to prove the charges and allegations herein. He claimed, in substance, that such "other crimes" evidence was inadmissible as: (1) irrelevant under Evidence Code section 210; (2) substantially more prejudicial than probative under Evidence Code section 352; and (3) impermissible character evidence under Evidence Code section 1101.

The People made a countermotion, effectively arguing to the contrary as to each of defendant's points. On the question of relevance, their position was that the challenged "other crimes" evidence "go[es] to show the defendant's intent—his intent to achieve sexual intercourse by use of whatever force it takes to cower the woman into sexual submission."

After a hearing, the court expressly granted defendant's motion and impliedly denied the People's countermotion. It determined that the challenged "other crimes" evidence was not irrelevant or impermissible character evidence. As to the former, it stated: "When you get down to intent, the pas[t] acts may have some rational and relevant pull on the question of intent." But it determined that the evidence was indeed substantially more prejudicial than probative because it was unnecessary: "I look at this as being a very[,] very strong case"; "The thing is overwhelming—completely overwhelming"; "I think we have to be very careful in this case that there is not overkill because of the facts involved and the evidence in the case." The court made its decision "without prejudice. In other words, if something occurs during the trial wherein the defense or someone else make[s] it relevant, then I will reconsider it."

For their part, the People moved *in limine* for permission to impeach defendant, should he testify, with five of the felony convictions arising out of the Lisa V./Caren F. incident—specifically, one count each of kidnapping, rape, sodomy, lewd conduct, and oral copulation.

In making their motion, the People relied on article I, section 28, subdivision (f) of the California Constitution and our decision in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]. The constitutional provision declares in pertinent part that "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding." In *Castro*, we held that "prior felony convictions" within the meaning of the constitutional provision are such as necessarily involve moral turpitude, i.e., a readiness to do evil. (38 Cal.3d at pp. 306, 313-317 (plur. opn. by Kaus, J.); *id.* at p. 322 (conc. & dis. opn. of Grodin, J.).) There, we also held that trial courts retain their discretion under Evidence Code section 352 to bar impeachment with such convictions when their probative value is sub-

stantially outweighed by their prejudicial effect. (*Id.* at pp. 306-313 (plur. opn. by Kaus, J.); *id.* at p. 323 (conc. & dis. opn. of Bird, C. J.).)

Defendant opposed the People's request. He impliedly conceded that the prior felony convictions selected by the People necessarily involved moral turpitude. But he urged that the use of even a single one for impeachment would be unduly prejudicial.

After a hearing, the court granted the People's motion in part and denied it in part. It stated: "[T]he defendant does not have a right to testify and give the false appearance that he is credible if there is impeaching evidence of prior felony convictions. And what the court must do is weigh the interest of the State and the People and have the truth be known against the defendant's right not to be unduly prejudiced." It went on: "I don't see—I don't know how I should or could allow impeachment on rape since it is exactly the same crime. The kidnapping too I think is too close to this one. But what I will allow is impeachment on one oral copulation, one sodomy and one [lewd conduct]."

Subsequently, in their case-in-chief the People called Susan Lanet as a witness. She testified, inter alia, that in the course of a conversation, defendant admitted that he killed Marion R.

After the People completed their direct examination, defendant sought a ruling from the court. Counsel represented that in order to present evidence on the narrow issue of intent to kill, he proposed to cross-examine Lanet on an extrajudicial statement defendant made to her in the same conversation in which he made his admission—to the effect that he killed Marion R. after a fight that was related not to sex but to the methamphetamine she evidently had in her possession and to some negative comments she allegedly made about criminals. Counsel asked whether such inquiry would "open[] the door" to the introduction of the challenged "other crimes" evidence on the broad issue of defendant's intent in the incident as a whole. The court declined to rule. It opined, however, that "I think you really are standing in the danger in this area." Counsel did not take Lanet on voir dire to determine whether she would actually testify as he had represented.

Defendant did not cross-examine Lanet on the extrajudicial statement identified above. Neither did he take the stand.

Defendant now contends that the court erred by granting the People's *in limine* motion in part and thereby allowing them to impeach him with his prior felony convictions for sodomy, lewd conduct, and oral copulation.

In *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173], we established the following rule—which is applicable to trials, like the present, beginning after finality of our decision therein: to preserve a claim such as this, the defendant must testify. (*Id.* at pp. 383-389 (lead opn. by Mosk, J.); *id.* at p. 396 (conc. opn. of Lucas, J.); *id.* at p. 397 (conc. opn. of Grodin, J.).) The reasons for the requirement are three in number.

First, " 'A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context.' . . . [Evidence Code section 352] requires the trial court to weigh the probative value of the conviction against its prejudicial effect, and 'To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when, as here, the defendant does not testify.' [Citation.] Likewise, an appellate court cannot review that balancing process unless the record discloses 'the. precise nature of the defendant's testimony.' . . .

"Second, . . . 'Any possible harm' from such an *in limine* ruling is 'wholly speculative.' To begin with, the trial court has discretion to make a different ruling as the evidence unfolds. Next, when the defendant does not testify, the reviewing court also has no way of knowing whether the prosecution would in fact have used the prior conviction to impeach . . . .

"Third, when the trial court errs in ruling the conviction admissible the reviewing court cannot intelligently weigh the prejudicial effect of that error if the defendant did not testify." (*People* v. *Collins, supra,* 42 Cal.3d at p. 384 (lead opn. by Mosk, J.), quoting *Luce* v. *United States* (1984) 469 U.S. 38, 41 [83 L.Ed.2d 443, 447, 105 S.Ct. 460].)

After consideration, we reject the claim at the threshold. Defendant did not testify. Hence, he did not preserve the point.

Below, defendant acknowledged the rule on the record. Here, he attempts to avoid its force.

To begin with, defendant argues that the rule is inapplicable. In support, he asserts the reasons are absent. Not so. First, we cannot know the "precise nature" of his "testimony"; at best, we may be able to discern the general lines of his extrajudicial statement. Second, we must deem the harm, if any, that may have arisen from the *in limine* ruling "wholly speculative": we can do no more than conjecture whether impeachment would actually have been allowed by the court and undertaken by the People. Third, assuming error, we cannot "intelligently weigh [its] prejudicial effect" because he did not testify.

Defendant then argues that the rule should not be applied, at least under the circumstances here, because he claims it "may work unfair results." ■■ ■ ■ We perceive no unfairness either generally or in this case.[1]

■ Defendant next contends that the court erred by ruling that his proposed cross-examination of Susan Lanet would "open the door" to the introduction of the challenged "other crimes" evidence.

This claim, too, we reject at the threshold. No ruling was made below. Accordingly, no review can be conducted here. "[T]he absence of an adverse ruling precludes any appellate challenge." (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1179 [9 Cal.Rptr.2d 834].) In other words, when, as here, the defendant does not secure a ruling, he does not preserve the point. That is the rule. No exception is available.

Defendant may be understood to maintain that the court did not properly decline to rule. Plainly, the appropriate standard of review is abuse of discretion. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 513 [250 Cal.Rptr. 550, 758 P.2d 1081].) The question is close. The court was obviously reluctant to make a decision of this kind in anticipation of facts that might subsequently come to light. Generally, such reluctance cannot be faulted.

[1]If we reached the merits, we would be inclined to find the claim wanting. A ruling of the sort in question is reviewed for abuse of discretion. (*People* v. *Clair* (1992) 2 Cal.4th 629, 655 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Abuse is not readily apparent. It seems altogether reasonable for the court to have allowed the People to impeach defendant with his prior felony convictions for sodomy, lewd conduct, and oral copulation. Manifestly, each of the three offenses involves moral turpitude. Indeed, there can be no serious argument to the contrary. (Cf. *People* v. *Mazza* (1985) 175 Cal.App.3d 836, 843-844 [221 Cal.Rptr. 640] [speaking of rape]; see also *People* v. *Massey* (1987) 192 Cal.App.3d 819, 822-824 [237 Cal.Rptr. 734] [holding that lewd conduct involves moral turpitude]; *People* v. *Mickle* (1991) 54 Cal.3d 140, 172 [284 Cal.Rptr. 511, 814 P.2d 290] [impliedly approving the *Massey* holding].) True, each of the three offenses bore some resemblance to the crimes charged here—and, as the court itself suggested, may have threatened some potential prejudice for that reason. But none was as close as kidnapping and rape—as to which the court barred impeachment.

Defendant makes an unpersuasive "procedural" argument against the court's ruling. "Of course, 'on a motion invoking [Evidence Code section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value . . . .' " (*People* v. *Mickey* (1991) 54 Cal.3d 612, 656 [286 Cal.Rptr. 801, 818 P.2d 84], quoting *People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) The record here does so. "[N]o more is required. Certainly, the trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation]." (*People* v. *Mickey*, *supra*, at p. 656.)

Defendant also makes an unpersuasive "substantive" argument. The court appears to have made an entirely sound decision. That it may have acted reasonably in barring the use of the challenged "other crimes" evidence for substantive purposes does *not* mean that it acted unreasonably in allowing the use of some such evidence for impeachment.

(See *People* v. *Williams* (1988) 44 Cal.3d 883, 912-913 [245 Cal.Rptr. 336, 751 P.2d 395].) Here, however, defendant expressed a not illegitimate need for a determination. The better course for the court might have been to make a ruling without prejudice. All the same, the course it actually took cannot be deemed unreasonable—especially in light of the fact that counsel did not take Lanet on voir dire to determine whether she would in fact testify as he had represented.

■ Defendant argues against the court's stated, but tentative, view that evidence on his extrajudicial statement and the narrow issue of intent to kill might "open the door" to the challenged "other crimes" evidence and the broad issue of intent in the incident as a whole. We are not persuaded. Contrary to defendant's implication, his state of mind *as to the killing* cannot realistically be isolated from his state of mind *as to the criminal activity in its entirety*.

Defendant also argues that the challenged "other crimes" evidence cannot be deemed "relevant" under Evidence Code section 210 to the broad issue of his intent in the incident as a whole. For support, he asserts that such intent was not a "disputed fact" within the meaning of the statutory provision. It was. He relies essentially on language in *People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], that "The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him 'in issue.' " But in *People* v. *Williams*, *supra*, 44 Cal.3d at page 907, footnote 7, we all but expressly disapproved *Thompson's* language and held to the contrary. Therefore, a fact—like defendant's intent—generally becomes "disputed" when it is raised by a plea of not guilty or a denial of an allegation. (Pen. Code, § 1019 ["The plea of not guilty puts in issue every material allegation of the accusatory pleading, except those allegations regarding previous convictions of the defendant to which an answer is required by [Penal Code] Section 1025."].) Such a fact remains "disputed" until it is resolved.

Defendant then argues that the challenged "other crimes" evidence cannot be deemed "relevant" under Evidence Code section 210 to the broad issue of his intent in the incident as a whole *even if* such intent was a "disputed fact" within the meaning of the statutory provision. He asserts that such other offenses are insufficiently similar to the offense here to be characterized as probative thereon. We disagree. Although far from identical, the "other crimes" evidence does indeed have *some* tendency to prove the disputed fact of intent in this case. That is all that Evidence Code section 210 requires.

Defendant next argues that the challenged "other crimes" evidence must be held substantially more prejudicial than probative. Again, we disagree.

We recognize that prior to trial, the court considered such evidence unduly prejudicial because it was unnecessary. It does not follow that the court would have been required to arrive at the same conclusion during trial if defendant had, in fact, introduced his extrajudicial statement, through the testimony of Susan Lanet, to the effect that he killed Marion R. after a fight unrelated to sex. In such a case, the court might have properly found the "other crimes" evidence "necessary."

■ Finally, defendant argues that the challenged "other crimes" evidence would have been impermissible character evidence under Evidence Code section 1101. Not so. Nothing in the statutory provision bars evidence of this sort when, as here, it is relevant to prove a fact other than disposition, including intent. (Evid. Code, § 1101, subd. (b).) "We have long recognized 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' [citations], and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution." (*People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355], italics in original.)

■ Defendant may also be understood to maintain that the court was required by Evidence Code section 356 to allow him to introduce his extrajudicial statement through the testimony of Susan Lanet without exposure to the challenged "other crimes" evidence. He asserts that such exposure amounts to an "undue penalty."

It is undisputed, and indisputable, that the court had to permit the extrajudicial statement. The court itself recognized as much. Evidence Code section 356 declares that "Where part of a[] . . . conversation . . . is given in evidence by one party"—as a portion of the interchange between defendant and Lanet was presented by the People—"the whole on the same subject may be inquired into by an adverse party . . . ."

It does not follow, however, that the court had to permit the extrajudicial statement *without exposure to the challenged "other crimes" evidence.* Manifestly, Evidence Code section 356 does not itself require such a result. Neither does any other provision or principle of law. Notwithstanding defendant's assertion, such exposure cannot be characterized as a "penalty,"

"undue" or otherwise. It is simply an apparently proper consequence, no more, no less.[2]

### B. Claim Relating to IN LIMINE Motions Concerning "State of Mind" Hearsay Evidence

Prior to trial, the People moved *in limine* for permission to introduce certain evidence pursuant to the state-of-mind exception to the hearsay rule—viz., Jeanne Weems's testimony to the effect that before leaving the Wild Idle Bar on March 16, 1986, Marion R. stated that "she better get herself home because she had a headache and she had to go to work in the morning." The People proposed to offer the evidence, essentially to show lack of consent to sexual intercourse on the part of Marion R., in an effort to prove the charge of rape and the allegation of the felony-murder-rape special circumstance.

Subdivision (b) of Evidence Code section 1200 states the rule that generally, "hearsay evidence is inadmissible." Subdivision (a) of the same provision defines "hearsay evidence" as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."

Evidence Code section 1250 establishes the state-of-mind exception. In its subdivision (a), it declares that "Subject to [Evidence Code] Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

Evidence Code section 1252 limits the state-of-mind exception: "Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

---

[2]Defendant claims that by ruling and *not* ruling as it did, the court committed error not only under the Evidence Code, but also under the United States Constitution—including the due process clauses of the Fifth and Fourteenth Amendments; the trial, confrontation, and counsel clauses of the Sixth Amendment; and the cruel and unusual punishments clause of the Eighth Amendment. He failed to make a sufficient argument below based on any federal constitutional provision. (The closest he came—which was plainly not close enough—was a perfunctory assertion that the challenged "other crimes" evidence was "inadmissible pursuant to . . . [the] United States Constitution[ ] . . . ." Hence, he may not raise such an argument here. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251-1252, 1264-1265 [270 Cal.Rptr. 451, 792 P.2d 251].) All the same, the court's ruling and "nonruling," whether considered separately or together, did not substantially implicate any federal constitutional guaranty.

For his part, defendant moved *in limine* to prohibit the People from introducing evidence of Marion R.'s extrajudicial statement. He claimed that the evidence was inadmissible as irrelevant, i.e., it did not have a tendency to prove any material fact. He also claimed that the evidence was inadmissible as hearsay not within the state-of-mind exception, i.e., it was untrustworthy because Marion R. (assertedly) spoke the words in order to deceive Weems as she secretly intended to go to a planned meeting with him. He finally claimed that the evidence was inadmissible as substantially more prejudicial than probative under Evidence Code section 352, i.e., it would subject him to unfair detriment by compelling him to defend against an uncharged offense of kidnapping and an unalleged special circumstance of felony-murder-kidnapping.

After a hearing, the court granted the People's motion and denied defendant's.

It determined that Marion R.'s extrajudicial statement was relevant. "It seems clear to me that this evidence does have some relevance to the question of whether or not a rape, as opposed to consensual intercourse, occurred. If indeed the victim's state of mind was to go home and go to bed forthwith and then there is—as the other evidence unfolds, that didn't happen and she ends up having intercourse with someone and there is other evidence that would tend to suggest that there was an interruption in her plans—the manner in which the car was parked and so forth—it sounds as though an inference that could very well be drawn from that was that it was a hurried, or unplanned, or unexpected event."

The court also determined that Marion R.'s extrajudicial statement came within the state-of-mind exception to the hearsay rule. It found the statement trustworthy. "The question of trustworthiness—the only thing to indicate that it's not trustworthy are the inferences that . . . the defense wishes to draw, and those certainly are inferences that somebody might draw. I mean, it's something that could be argued from simply the fact that the victim and the defendant were together later in the evening, and it is not outside the realm of human experience that a woman might . . . give an excuse to her friends why she's leaving, if she intends to meet with a man. That sort of conduct is not unheard of. On the other hand, I don't see anything in this case that particularly points to that conclusion."

Lastly, the court determined that Marion R.'s extrajudicial statement was not substantially more prejudicial than probative. As noted, it found the evidence relevant to rape. It also found it not unfairly detrimental. "The only question is, by suggesting something that the jury might interpret as a

kidnapping, whether or not they ever receive any instructions on a kidnapping, I don't see that that outweighs the probative value of this evidence. In fact, I find that it does not."

Subsequently, during the People's case-in-chief, Weems testified, inter alia, that before leaving the Wild Idle Bar on March 16, 1986, Marion R. stated that "she was not feeling very well, she had a terrible headache," and that "she had to go to work early the next morning and she needed to go home because she had a terrible headache and she needed to get some sleep."

Defendant contends that by ruling as it did, the court erred. ■ The appropriate standard of review is abuse of discretion. That test is proper when, as here, the determination under attack concerns the admissibility of evidence. (See *People* v. *Clair, supra,* 2 Cal.4th at p. 671.) Underlying that determination are questions of (1) relevance, (2) hearsay rule/state-of-mind exception, and (3) undue prejudice. Of course, abuse of discretion is appropriate for the first and third issues. (*Id.* at p. 660.) ■ ■ ■ ■ So too for the second. (Cf. *People* v. *Gordon, supra,* 50 Cal.3d at pp. 1250-1251 [dealing with the hearsay rule and the declaration-against-interest exception].)[3]

■ Having examined the matter carefully, we find no error.

The court did not abuse its discretion in determining that Marion R.'s extrajudicial statement was relevant. The evidence was clearly probative of rape.

Nor did the court abuse its discretion in determining that Marion R.'s extrajudicial statement came within the state-of-mind exception to the hearsay rule. Its statement of reasons, quoted above, is sound. Defendant argues to the contrary. Here, as below, he attacks the trustworthiness of the extrajudicial statement. The court did not discern indicia of untrustworthiness. Nor do we. True, as the court itself recognized, Marion R. might possibly have spoken falsely. But such a possibility is not enough.

---

[3]Defendant did not object to Weems's testimony as it was being elicited. His failure to do so is not fatal to his claim. "[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949].) Defendant's motion satisfied these requirements.

Neither did the court abuse its discretion in determining that Marion R.'s extrajudicial statement was not substantially more prejudicial than probative. Here too, its statement of reasons, quoted above, is sound.[4]

## C. *Claim Relating to In Limine Motion Concerning Expert Opinion Testimony on Genital Trauma in Rape*

Prior to trial, defendant moved *in limine* to prohibit the People from introducing expert opinion testimony on genital trauma in rape. The People expressed an intent to offer evidence, through Steven Kent Sierra, M.D., to the effect that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse. They wished to do so in order to dispel any erroneous belief on the part of any juror that "no genital trauma" means "no rape."

In support of his motion, defendant claimed, inter alia, that the challenged testimony was inadmissible under the *Kelly-Frye* rule (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145]), which conditions the "admissibility of expert testimony based upon the application of a new scientific technique" on a "preliminary showing of general acceptance of the new technique in the relevant scientific community." (*People* v. *Kelly, supra,* at p. 30.) He relied primarily on *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]. There, we held that evidence of so-called "rape trauma syndrome"—i.e., "an 'umbrella terminology' which includes a very broad spectrum of physical, psychological, and emotional reactions" to rape (*id.* at p. 241, fn. 4)—was inadmissible under the *Kelly-Frye* rule as a means of proving that rape had, in fact, occurred. (*Id.* at pp. 246-251.) We stated, however, that such evidence "may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247-248.)

The People opposed the request, arguing in relevant part that the *Kelly-Frye* rule did not apply and hence that *Bledsoe* did not govern.

After a hearing, the court denied the motion. As pertinent here, it concluded that the *Kelly-Frye* rule was inapplicable: the challenged testimony

---

[4]Defendant claims that by ruling as it did, the court committed error not only under the Evidence Code, but also under the United States Constitution—including the due process clauses of the Fifth and Fourteenth Amendments; the confrontation clause of the Sixth Amendment; and the cruel and unusual punishments clause of the Eighth Amendment. He failed to make any argument below based on any federal constitutional provision. Hence, he may not raise such an argument here. In any event, the court's ruling did not substantially implicate any federal constitutional guaranty.

did not rely on a "new scientific technique." It also concluded that *Bledsoe* did not control: legally, the testimony in question did not come within the ambit of the *Kelly-Frye* rule; factually, it did not bear on the rape trauma syndrome; and finally, it was offered not to prove rape but merely to "disprove" "no rape."

Subsequently, during the People's case-in-chief, Dr. Sierra was called as a witness to offer expert medical opinion. Before he was summoned, defendant renewed his motion, but was unsuccessful. Dr. Sierra testified that he was a physician with specialties in emergency medicine and diagnostic radiology; was Chief of Emergency Services at Chope Hospital, which had been designated the Sexual Assault Trauma Center for San Mateo County; had physically examined about 300 patients complaining of rape over about 14 years; and was acquainted with the medical literature dealing with rape and related subjects. He opined that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse.

Defendant contends that by ruling as it did, the court erred. As noted, a decision of this sort, which concerns the admissibility of evidence, is subject to review for abuse of discretion. This is especially so when, as here, the evidence comprises expert opinion testimony. (See *People* v. *McDonald* (1984) 37 Cal.3d 351, 373 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) Underlying determinations, of course, are scrutinized pursuant to the test appropriate thereto. The conclusion that a certain legal principle, like the *Kelly-Frye* rule, is applicable or not in a certain factual situation is examined independently. (Cf. *People* v. *Clair, supra,* 2 Cal.4th at p. 678 [holding that the conclusion that *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], does not apply on certain facts is examined independently].)

 After review, we find no error. The dispositive question—which plainly subsumes *Bledsoe*—is whether the *Kelly-Frye* rule is applicable to expert medical opinion that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse. The court answered no. On independent review, we agree. "We have never applied the *Kelly-Frye* rule to expert medical testimony . . . ." (*People* v. *McDonald, supra,* 37 Cal.3d at p. 373.) We shall not do so now. Dr. Sierra's testimony implicated no "new scientific technique" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30) within the meaning of the rule. It was based fundamentally on physical examination—by Dr. Sierra himself and by other experts as well. In *People* v. *Stoll* (1989) 49 Cal.3d 1136, 1157 [265 Cal.Rptr. 111, 783 P.2d 698], we broadly held that "absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*." It is manifest that Dr. Sierra's testimony exhibited no such "special feature."

Defendant claims, in substance, that expert medical opinion that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse is erroneously admitted unless it is introduced in response to evidence or argument that "no genital trauma" means "no rape"—a condition that he asserts was not met here. We reject the point. Defendant's analysis lacks compelling authority or persuasive reasoning. Indeed, it merely proves that such expert medical opinion is proper as a response—not that it is proper *only* as a response.[5]

### D. *Claim Relating to In LIMINE Motion for Separate Juries at the Guilt and Penalty Phases*

Prior to trial, defendant moved *in limine* for an order directing the impanelment of one jury to try guilt and death eligibility and, if necessary, the impanelment of another to try penalty.

Defendant relied, inter alia, on Penal Code section 190.4, subdivision (c), which states in pertinent part: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn."

As relevant here, defendant's argument was effectively bottomed on the desire of counsel to examine prospective jurors in one way for the guilt phase and in a different way for the penalty phase. Counsel expressed a belief that "other crimes" evidence might not be presented in the former but would be presented in the latter. They wished to voir dire prospective penalty phase jurors on such evidence, but not prospective guilt phase jurors.

The People opposed the request. They argued that defendant was premature and, in any event, had not shown good cause.

After a hearing, the court granted the motion. It ordered that "if the defendant is convicted and if the special circumstances [*sic*] are found, we will discharge the first jury and choose another jury."

Thereupon, the People filed a petition for writ of mandate in the Court of Appeal for the First Appellate District. In a published opinion, Division

---

[5]Defendant claims that by ruling as it did, the court committed error not only under the *Kelly-Frye* rule, but also under the United States Constitution—including the due process clauses of the Fifth and Fourteenth Amendments. He failed to make any argument below based on any federal constitutional provision. Hence, he may not raise such an argument here. In any event, the court's ruling did not substantially implicate any federal constitutional guaranty.

Three of that court caused issuance of a peremptory writ in the first instance, directing the court to vacate its order. (*People* v. *Superior Court* (*Rowland*) (1987) 194 Cal.App.3d 11 [239 Cal.Rptr. 257].) It reasoned that "Penal Code section 190.4, subdivision (c), . . . does not permit a pretrial 'discharge' of the guilt phase jury": the court is simply "without jurisdiction to entertain a pretrial motion for a second jury." (*Id.* at p. 13.)

Between the guilt and penalty phases, defendant renewed his motion. This time, the court denied relief, finding no good cause therefor.

Defendant contends that by denying his renewed motion, the court erred.[6]

The appropriate standard of review is abuse of discretion. (See *People* v. *Beardslee* (1991) 53 Cal.3d 68, 101-102 [279 Cal.Rptr. 276, 806 P.2d 1311].)

No abuse appears. In *People* v. *Nicolaus* (1991) 54 Cal.3d 551 [286 Cal.Rptr. 628, 817 P.2d 893], we recognized that Penal Code section 190.4, subdivision (c), "expresses a clear legislative intent that both the guilt and penalty phases of a capital trial be tried by the same jury." (54 Cal.3d at p. 572.) There, we held that the "mere desire" of defense counsel "to voir dire in one way for the guilt phase and a different way for the penalty phase" "does not constitute 'good cause' for deviating from the clear legislative mandate . . . ." (*Id.* at pp. 573-574.) Here, such a "desire" existed—and substantially nothing more. We understand counsel's wishes in this regard. But we cannot deem them sufficient.

Defendant may be understood to argue that the court's order granting his original motion was sound, and should not have been disturbed by the Court of Appeal. We are not persuaded. It is true, contrary to the Court of Appeal's conclusion, that the court had authority to entertain the motion, even though it was made prior to trial. (See *People* v. *Beardslee, supra,* 53 Cal.3d at pp.

---

[6]Defendant requests us to take judicial notice of the record filed in the Court of Appeal in *People* v. *Superior Court* (*Rowland*), *supra,* 194 Cal.App.3d 11. We may, of course, "take judicial notice" (Evid. Code, § 459, subd. (a)) of the "[r]ecords of . . . any court of this state" (*id.,* § 452, subd. (d)). We fail to see—and certainly, defendant fails to show—the relevance of the subject record. From all that appears, the court did not make any determination in light thereof. "Because . . . no evidence is admissible except relevant evidence, it is reasonable to hold that judicial notice, which is a substitute for formal proof of a matter by evidence, cannot be taken of any matter that is irrelevant . . . ." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Judicial Notice, § 47.1, p. 1749.) Consequently, we deny the request.

101-102.) But it is also true, for the reasons stated above, that the court did not have discretion to order the relief sought.[7]

### E. *Sufficiency of the Evidence for the Rape Conviction*

Defendant contends that the evidence is insufficient to support his conviction for rape.

 In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781], italics in original.) To our mind, we must ask the same question when we conduct such review under the due process clause of article I, section 15 of the California Constitution.

A state court conviction that is not supported by sufficient evidence violates the due process clause of the Fourteenth Amendment and is invalid for that reason. (*Jackson* v. *Virginia, supra,* 443 U.S. at pp. 313-324 [61 L.Ed.2d at pp. 569-576].) In our view, a California conviction without adequate support separately and independently offends, and falls under, the due process clause of article I, section 15.

 Defendant's claim is to the following effect: although the evidence is sufficient to prove that he engaged in sexual intercourse with Marion R., it is insufficient to prove that he did so while she was alive *or* without her consent.

Of course, in rape the act of sexual intercourse must involve a live victim (*People* v. *Kelly* (1992) 1 Cal.4th 495, 524 [3 Cal.Rptr.2d 677, 822 P.2d 385]) who does not effectively consent (see Pen. Code, § 261).

The evidence is more than sufficient on each point. To support our conclusion, we need cite only this. There was expert testimony that before

---

[7]Defendant claims that by denying his renewed motion, the court committed error not only under Penal Code section 190.4, subdivision (c), but also under the United States Constitution (including the trial and counsel clauses of the Sixth Amendment, the cruel and unusual punishments clause of the Eighth Amendment, and the due process clause of the Fourteenth Amendment) and the California Constitution (including the jury trial clause of article I, section 16). He failed to make a sufficient argument below based on any constitutional provision. Hence, he may not raise such an argument here. In any event, the court's ruling did not substantially implicate any constitutional guaranty.

death, Marion R. suffered a bruise "an inch or two above the [right] kneecap and somewhat towards the inside part of the thigh"; the location of the injury was "unusual"; such a bruise, however, could have been caused "if someone used a knee . . . to force the legs apart." Relying on that testimony, as it would plainly have been entitled to, a rational trier of fact could surely have found beyond a reasonable doubt that at the time defendant engaged in sexual intercourse, Marion R. was alive *and* did not consent.

Defendant argues to the contrary. His words establish nothing more than that some rational trier of fact might have made a different finding. That is not enough.[8]

### III. DEATH-ELIGIBILITY ISSUES

Defendant challenges the determination that he was subject to the death penalty. As relevant here, death eligibility is established when the defendant is convicted of murder in the first degree under at least one special circumstance. (Pen. Code, § 190.3.) As shown above, defendant has not successfully attacked the jury's verdict of guilty as to murder in the first degree. As shown below, he does not successfully attack its felony-murder-rape special-circumstance finding. Hence, the challenge fails.

#### A. *Instruction on the Felony-murder-rape Special Circumstance*

The felony-murder-rape special circumstance is defined as the commission of "murder . . . while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit," the felony of rape. (Pen. Code, § 190.2, subd. (a)(17)(iii).)

The court instructed the jury that in order to find the felony-murder-rape special-circumstance allegation to be true, it was required to find, among other facts, that "the murder was committed while the defendant was engaged in the commission of a rape." At trial, there was no request for explanation or amplification, either by the People or by defendant.

Defendant now contends that the court erred by failing to define the phrase "while engaged in" sua sponte.

The court did not err. When, as here, a phrase "is commonly understood by those familiar with the English language and is not used in a technical

---

[8]Defendant claims that his rape conviction, if based on evidence that is insufficient for the due process clause of the Fourteenth Amendment, is invalid not only under that federal constitutional provision but under others as well—including some unspecified clause of the Sixth Amendment and, perhaps, the cruel and unusual punishments clause of the Eighth Amendment. The conviction is *not* based on insufficient evidence.

sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." (*People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) As noted, there was no such request. (Compare *People* v. *Guzman* (1988) 45 Cal.3d 915, 949-952 [248 Cal.Rptr. 467, 755 P.2d 917] [concluding that a similar instructional omission was nonerroneous on a similar record].)[9]

Defendant claims that the court did indeed err. His argument is not persuasive. For example, he asserts that the phrase "while engaged in" was, in fact, used in a technical sense. Not so. We agree that the application of the words to a given set of facts may prove uncertain. But we do not agree that the words themselves are somehow unclear. He also asserts that the phrase does not adequately define the requisite temporal relationship between the murder and the rape. This point is essentially a restatement of the preceding. It also falls. Lastly, he asserts that the phrase was somehow rendered ambiguous by the prosecutor's summation and other instructions. The record is otherwise.[10]

### B. Sufficiency of the Evidence for the Felony-murder-rape Special-circumstance Finding

Defendant contends that the evidence is insufficient to support the felony-murder-rape special-circumstance finding.

■ "In reviewing the sufficiency of evidence for a special circumstance" —as for a conviction—"the question we ask is whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." (*People* v. *Mickey*, *supra*, 54 Cal.3d at p. 678, italics in original.)[11]

■ Defendant's claim is that the evidence is insufficient to prove that he murdered Marion R. "while engaged in" rape. We disagree. A rational trier of fact could have found the requisite temporal relationship between the

---

[9]In passing, we note that it is manifest why defendant did not request an instruction on the meaning of the phrase "while engaged in" at trial. His defense was predicated on the assertion that there was no rape—specifically, no *nonconsensual* sexual intercourse—in the first place. Obviously, this defense proved unsuccessful. But it was not unreasonable.

[10]Defendant claims in substance that by erring under California law, the court erred as well under the United States Constitution—including, apparently, the due process clause of the Fourteenth Amendment. There *was* no error under California law.

[11]We need not, and do not, reach the question whether the sufficiency-of-evidence review specified in the text is required under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution.

two crimes beyond a reasonable doubt. The evidence showed that defendant killed Marion R. in the course of a fight. Defendant admitted as much in his extrajudicial statement to Susan Lanet. The evidence also showed that the fight involved rape. Defendant's position at trial was that there was no rape—specifically, no *nonconsensual* sexual intercourse. But the expert testimony about the "unusual" ante mortem bruise "an inch or two above the [right] kneecap and somewhat towards the inside part of the thigh" was plainly to the contrary.

Again, defendant argues to the contrary. Again, his words establish nothing more than that some rational trier of fact might have made a different finding. Again, that is not enough. To the extent that he asserts that for purposes of the felony-murder-rape special circumstance, the defendant must commit murder and rape virtually simultaneously, he is simply wrong. By its very terms, the special circumstance extends even to murder during the "immediate flight after" rape. (Pen. Code, § 190.2, subd. (a)(17)(iii).)[12]

## IV. Penalty Issues

Defendant raises a number of claims attacking the judgment as to penalty. As will appear, none is meritorious.

### A. *Motion to Bar Testimony by Caren F.*

As noted, at the penalty phase the People sought to prove several instances of other violent criminal activity—one of the issues material to penalty under Penal Code section 190.3—including the Lisa V./Caren F. incident.

In the People's case-in-aggravation, Lisa V. testified on direct examination to matters including the following: on November 7, 1980, when she was thirteen years old, defendant and another man kidnapped her and her friend Caren F. in Fremont; Caren escaped; she attempted to, but failed; defendant helped the other man rape her twice; defendant himself raped her four times,[13] caused her to orally copulate him, sodomized her twice, and fondled her genital organs and other parts of her body; during the attack, he repeatedly threatened her with death if she resisted. Lisa was not cross-examined.

---

[12]Defendant may be understood to claim that the felony-murder-rape special-circumstance finding, if based on evidence that is insufficient for the due process clause of the Fourteenth Amendment, is invalid not only under that federal constitutional provision but under others as well—including some unspecified clause of the Sixth Amendment and, perhaps, the cruel and unusual punishments clause of the Eighth Amendment. As noted, we need not, and do not, reach the due process question. (See fn. 11, *ante.*) In any event, the finding is *not* based on insufficient evidence.

[13]Documentary evidence showed that defendant had, in fact, raped Lisa V. six times.

Outside the presence of the jury, defendant moved to prohibit any testimony by Caren F., claiming, inter alia, that such evidence would be substantially more prejudicial than probative under Evidence Code section 352. Stating that he had not cross-examined Lisa V. and would not cross-examine Caren F., counsel argued that the testimony in question would be "cumulative," "[t]ime consuming," and inflammatory. The prosecutor opposed the request. He represented that Caren would testify to the kidnapping she herself had suffered at the hands of defendant and his partner, and to limited surrounding facts. The court denied the motion. It determined that the testimony as represented would be "relevant" and "neither excessively time consuming nor cumulative. I think its probative value outweigh[s] any possible prejudice that may be from the fact that there may be some cumulative aspects to it . . . ."

Caren F. then testified on direct examination to matters including the following: on November 7, 1980, when she was 13 years old, defendant and another man kidnapped her and her friend Lisa V. in Fremont; she escaped; Lisa attempted to, but failed. Caren was not cross-examined.

Defendant now contends that by denying his motion, the court erred. We disagree. No abuse of discretion appears. Caren F.'s testimony as represented to the court was highly probative: it was direct evidence, from her own lips, of the kidnapping she herself had suffered. Moreover, it was minimally prejudicial: it was insignificantly cumulative, limited in extent, and not at all inflammatory. The same is true of Caren's testimony as subsequently presented to the jury. There was no error. There could be no prejudice.[14]

B. *Ineffective Assistance of Counsel*

Defendant contends that trial counsel provided him with ineffective assistance under the Sixth Amendment to the United States Constitution by failing to call Susan Lanet as a witness in order to elicit his extrajudicial statement to the effect that he killed Marion R. after a fight unrelated to sex.

To succeed in his claim, defendant must show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice

---

[14]Defendant claims that by denying his motion, the court committed error not only under Evidence Code section 352, but also under the United States Constitution, including the due process clause of the Fourteenth Amendment. He failed to make an argument below based on any federal constitutional provision. Hence, he may not raise such an argument here. In any event, the court's ruling did not substantially implicate any federal constitutional guaranty. Contrary to his assertion, Caren F.'s testimony was not inflammatory as represented to the court. Neither was it inflammatory as subsequently presented to the jury.

under a test of reasonable probability. (E.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839].)

Defendant fails in his attempt. Counsel's performance was not deficient because the omission was not unreasonable. In view of the evidence concerning the circumstances of the present offenses adduced at the guilt phase, counsel could properly have declined to reopen the matter—especially through a self-serving, out-of-court statement by defendant. Moreover, even if counsel's performance had been deficient, it could not have subjected defendant to prejudice. There is no reasonable probability that the introduction of a statement of the sort here would have affected the outcome.[15]

## C. *Prosecutorial Misconduct*

Defendant contends that the prosecutor engaged in misconduct on several occasions in the course of the penalty phase, in violation of California law and/or the United States Constitution, as he adduced evidence and presented argument before the jury.

■ "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury." (*People* v. *Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

" 'It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.] There are, indeed, certain exceptions. For example, the rule is inapplicable when the harm could not have been cured. [Citation.] But there is no exception for capital trials as such." (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 662, quoting *People* v. *Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330].)

In all respects save one, we reject the claim of misconduct on procedural grounds. In all but a single instance, the rule requiring assignment of

---

[15]Defendant claims that trial counsel's ineffective assistance under the Sixth Amendment entailed the violation of various provisions of the United States Constitution, including the due process clauses of the Fifth and Fourteenth Amendments; the trial clause of the Sixth Amendment; and the cruel and unusual punishments clause of the Eighth Amendment. But as shown, counsel's assistance was *not* ineffective.

Evidently, defendant does not claim that trial counsel provided him with ineffective assistance under article I, section 15 of the California Constitution. If he did, he would fail. To establish such a point under the state constitutional provision as under the federal, he would be required to show (1) deficient performance under an objective standard of professional reasonableness and (2) prejudice under a test of reasonable probability. (*People* v. *Ledesma*, *supra*, 43 Cal.3d at pp. 215-218.) As explained above, he cannot do so.

misconduct and request for admonition was not satisfied: defense counsel did not make any objection of any kind on any basis. Further, no exception appears. For instance, contrary to defendant's assertion, any "harm" was readily curable. And, as stated, there is no exception for capital trials—"not even for the penalty phase thereof" (*People* v. *Clair, supra,* 2 Cal.4th at p. 685).

In all respects without qualification, we reject the claim of misconduct on the merits: there was no impropriety. Our reasons follow.

 Defendant first complains of the prosecutor's unobjected-to cross-examination of defense witness James W.L. Park, a "correctional consultant."

On direct examination, defense counsel elicited brief testimony from Park on the conditions of confinement for a person sentenced to life imprisonment without possibility of parole. He did so in an evident attempt to show substantial restrictions on freedom and minimal opportunities for violence.

On cross-examination, the prosecutor elicited testimony from Park that was briefer still on the same matter, including such specific topics as the availability of privileges, access to illicit drugs and alcohol, and the presence of women among prison staff. He did so in an evident attempt to make a showing contrary to defense counsel's, indicating the liberties that might be enjoyed and the occasions that might arise for inflicting physical harm, sexual and otherwise.

A prosecutor, of course, may seek to disprove on cross-examination what defense counsel sought to prove on direct examination. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1270.) The prosecutor here did that—and substantially nothing more. Defendant asserts that the inquiry on cross-examination went beyond that on direct examination, improperly touching on such issues as future dangerousness. The assertion, however, is not supported by the record.[16]

 Second, defendant complains of certain unobjected-to comments in the prosecutor's summation that allegedly misled the jury on its role in determining penalty.

---

[16]Defendant claims that the evidence elicited on cross-examination was inadmissible under both California law and the United States Constitution. We reject the point. "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.'" (*People* v. *Benson, supra,* 52 Cal.3d at p. 786, fn. 7, quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) At trial, defense counsel failed to make any objection whatever. Contrary to what defendant appears to argue, the omission did not constitute ineffective assistance in violation of the Sixth Amendment. Counsel's performance was not deficient: it was not "objectively unreasonable . . . to

In context, the message the prosecutor delivered was this: the jurors' function was judicial, not legislative; they had to decide whether the death penalty was the appropriate punishment in this case, not whether it should be available as a sanction in general. That message, of course, was altogether sound.

We do not overlook—and certainly do not approve—such remarks as this: "We had a recent election in which several of our Supreme Court justices were perceived by the voters not to be applying [the death penalty] law. They are gone now. There's no question that it is the policy expressed by the will of the populace that there be a death penalty in California, and that it be carried out in appropriate cases." Or this: "[T]he voters overwhelmingly approved the death penalty . . . ."

Nevertheless, there is no reasonable likelihood that the jury understood the challenged remarks as defendant asserts—and surely not in such a way as to "minimize [its] sense of responsibility for determining the appropriateness of death" in violation of the Eighth Amendment to the United States Constitution as construed in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 341 [86 L.Ed.2d 231, 247, 105 S.Ct. 2633].

■ Third, defendant complains of certain unobjected-to comments in the prosecutor's summation that disparaged psychiatry and psychiatrists, including defense witness Hugh Wilson Ridlehuber, M.D.

The challenged remarks were indeed harsh and unbecoming. For example, at one point the prosecutor stated: "But as a lawyer, you know, when all else fails, you call in the psychiatrists. It's the kind of thing that has caused such controversy in the public about the role of psychiatry in the courtroom. I think that it's no secret that psychiatry is guesswork, conjecture, theories, untested theories."

At another: "And psychiatrists just can't accept that some people make bad choices because they make bad choices. They have to find reasons for it.

---

remain silent and thereby call no attention to the prosecutor's [questioning]" (*People* v. *Gordon*, *supra*, 50 Cal.3d at p. 1256, fn. 7)—especially when, as here, the questioning was relatively brief.

Defendant also claims that the prosecutor engaged in misconduct by referring in his summation to the evidence elicited on cross-examination. There was no objection. In any event, there was no impropriety. The challenged comments comprised an unproblematic argument to the effect that life imprisonment without possibility of parole was not the appropriate punishment in this case. There is no reasonable likelihood that the jury understood the words otherwise. (*People* v. *Clair*, *supra*, 2 Cal.4th at pp. 662-663 [stating the "reasonable likelihood" standard as the test for determining whether the jury misconstrued or misapplied comments by a prosecutor].)

And they delve back in the past, and they guess and conjecture, and they come up with things to excuse responsibility. Now, the thing that was most disturbing about that is the quality of this man's [i.e., Dr. Ridlehuber's] testimony. Sure, he knows all the words. He's an educated man. He's eloquent. He's got a good background. And why he chooses to use it for this purpose, to use his education and training for what he does, I don't know."

At yet another: "Apparently, he [i.e., Dr. Ridlehuber] was hired to see if there was something . . . he could find to explain this behavior. And he found it."

Although harsh and unbecoming, the challenged remarks constituted reasonable—if hyperbolic and tendentious—inferences from the evidence. There is no reasonable likelihood that the jury understood the words otherwise.

For instance, Dr. Ridlehuber himself admitted that "psychiatry is not an exact science"; that psychiatrists rely on what they are told by their patients, who sometimes lie; that "two equally competent psychiatrists can conduct an examination on an individual and come to different conclusions"; and that psychiatrists "can be fooled, and I've been fooled." Also, as noted, there was evidence showing defendant's interest in psychology and suggesting manipulation on his part.

Moreover, in his opening statement at the penalty phase defense counsel indicated that Dr. Ridlehuber would testify that he had arrived at a different diagnosis from that of other, unnamed persons—even though at the time of the opening statement Dr. Ridlehuber (as he subsequently revealed) had not yet arrived at a diagnosis.

In the challenged remarks, the prosecutor did not substantially misstate the facts or go beyond the record. Surely, his personal attack on Dr. Ridlehuber "was somewhat insulting in its implications . . . ." (*People* v. *Frank* (1990) 51 Cal.3d 718, 737 [274 Cal.Rptr. 372, 798 P.2d 1215].) But it did not amount to a deceptive or reprehensible method of persuasion.

 Fourth, defendant complains of certain unobjected-to comments in the prosecutor's summation that allegedly suggested that the "judicial system unfairly protects the defendant at the expense of ignoring the victim." (Initial capitalization omitted.)[17]

We believe that the jury must have taken the challenged remarks at face value: in determining penalty, it was required to consider not only the

---

[17]The comments in question are set out below.

"And mercy is another theme you're going to hear. . . .

"As you're thinking about mercy for Guy Rowland, I want to give you the counter thing

criminal but also his crime. That proposition is manifestly sound. Defendant asserts that "[t]he prosecutor's remarks . . . had only one thrust—use of the judicial process is a further aggravation of the crime." There is simply no reasonable likelihood that the jury so understood the words.

■ Fifth, defendant complains of the following unobjected-to comment in the prosecutor's summation: "And his mother—I think his mother understands justice, to some extent. Because when asked about anything that she wanted to tell you, she really couldn't bring herself to tell you that he didn't deserve the death penalty based on the evidence that you had before you. Instead, what she said was her religion says that there shouldn't be a death penalty."

The challenged remark constituted a fair comment on the evidence. There is no reasonable likelihood that the jury would have understood the words otherwise.

■ Sixth, defendant complains of unobjected-to comments in the prosecutor's summation to the effect that in determining penalty, the jury could consider evidence bearing on defendant's background but not his family's.

The defendant's background is, of course, material to penalty. That is true under California law (see, e.g., *People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782], following *People* v. *Easley* (1983) 34 Cal.3d 858, 877-878 [196 Cal.Rptr. 309, 671 P.2d 813] [impliedly construing Pen.

---

that I think you should be thinking about.

"Think about the mercy that this man granted to Marion [R.]. . . .

"I want to read you a brief paragraph from the book called, 'The Killing of Bonnie Garland.' It's a case that occurred back in New York, Albany. A man named Willard Gatland, a psychiatrist, wrote a book about it. In the prologue he makes an interesting observation. I'd like to point that out to you.

" 'When one person kills another, there is an immediate revulsion at the nature of the crime. But in a time so short as to seem indescent [*sic*] to the members of the personal family, the dead person ceases to exist as an identifiable figure.

" 'To those individuals in the community of goodwill and empathy, warmth and compassion, only one of the key actors in the drama remains with whom to commiserate; and that is always the criminal.

" 'The dead person ceases to be a part of every day reality; ceases to exist. She is only a figure in a historic event.

" 'And we inevitably turn away from the past towards the ongoing reality. And the ongoing reality is the criminal; trapped, anxious, now helpless, isolated, perhaps badgered, perhaps bewildered. He ursurps [*sic*] the compassion that is justly the victim's. And he will steal his victim's moral constituency along with her life.'

"Don't let that happen. He does not deserve your sympathy. He doesn't deserve your goodwill. He doesn't deserve your pity. He doesn't deserve your warmth. He doesn't deserve your compassion. He doesn't deserve your mercy, nor does he deserve your leniency."

Code, § 190.3]) and the United States Constitution (see, e.g., *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869], following *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn. by Burger, C. J.) [construing U.S. Const., Amend. VIII, as applied to the states through the due process clause of Amend. XIV]). The conclusion follows from the proposition that "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio*, *supra*, at p. 604 [57 L.Ed.2d at p. 990], italics in original (plur. opn. by Burger, C. J.) [construing U.S. Const., Amend. VIII, as applied to the states through the due process clause of Amend. XIV]; accord, *People* v. *Easley*, *supra*, at pp. 877-878 [impliedly construing Pen. Code, § 190.3].)

By contrast, the background of the *defendant's family* is of no consequence in and of itself. That is because under both California law (e.g., *People* v. *Gallego* (1990) 52 Cal.3d 115, 207 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.) [construing Pen. Code, § 190 et seq.]) and the United States Constitution (e.g., *Enmund* v. *Florida* (1982) 458 U.S. 782, 801 [73 L.Ed.2d 1140, 1154, 102 S.Ct. 3368] [construing U.S. Const., Amend. VIII]), the determination of punishment in a capital case turns on the defendant's personal moral culpability. It is the "*defendant's* character or record" that "the sentencer . . . [may] not be precluded from considering"— not *his family's*. (*Lockett* v. *Ohio*, *supra*, 438 U.S. at p. 604 [57 L.Ed.2d at pp. 989-990], italics added (plur. opn. by Burger, C. J.); compare *People* v. *Cooper* (1991) 53 Cal.3d 771, 844 & fn. 14 [281 Cal.Rptr. 90, 809 P.2d 865] [leaving open the question whether the "impact [of a death verdict] on the defendant's family" is material under U.S. Const., Amend. VIII]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 243 [3 Cal.Rptr.2d 426, 821 P.2d 1302] [following *Cooper*].)

To be sure, the background of the defendant's family is material if, and to the extent that, it relates to the background of defendant himself. But that very point emerges from the challenged remarks. For example, the prosecutor stated: "Again, think back and decide how much of this extremely emotional and painful testimony you heard about Guy Rowland's family applies to him rather than other people. The things that don't apply to him are not things you can consider in determining whether or not Guy Rowland is entitled to sympathy." Thus—the prosecutor declared expressly—the background of defendant's family does not matter if it does not touch his

own. But—he implied—family background does count if it involves defendant himself. There is no reasonable likelihood that the jury understood the words otherwise.[18]

 Seventh, defendant complains of the concluding comments in the prosecutor's summation.

". . . And I've made a long practice in my life never to ask others to do what I would not feel is right, and what I would not do myself.

"I believe strongly in the sanctity of human life, and I would not ask you to do something that I would not do. And I believe in human life. But I also believe that society has the right, in fact tne duty, to protect itself and to see that justice is done in the appropriate cases.

"And based in the system of justice where the punishment should fit the crime and the criminal, based on the law in this case . . . , based on the savagery, and the brutality, and the horror of the crime against Marion [R.], based on his history of past criminal activity involving violence which represents a man of extreme cruelty, depravity, and violence, I now stand before you, and with a full realization of the awesome responsibility that's been entrusted to you and to me, and with a full realization of the gravity and the enormity of what I am about to ask you, without reservation, without hesitation, I am asking that you return a verdict of death."

Outside the presence of the jury, defense counsel requested the court "to instruct the jury on one comment made by [the prosecutor]. And that went to his personal opinion in this matter concerning the sentence of death. I think that's improper under the cases. And I would ask the court to admonish the jury that they should not consider [the prosecutor's] personal feelings in arriving at the appropriate penalty."

The court refused. "I think the prohibition goes to personal belief in evidence, evidence not before the jury. And he very carefully didn't do that. I know of no rule of law to support the action you're requesting. I think it's an appropriate argument. He very carefully didn't imply that he knows something that the jury doesn't know. I think it's an appropriate argument."

We agree. True, a prosecutor may not "state his personal belief regarding . . . the appropriateness of the death penalty, *based on facts not in evidence*."

---

[18]Defendant claims that defense counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object to the "misconduct." He also claims that the court committed error apparently under California law by neglecting to prevent or cure the "harm" arising therefrom *ex proprio motu*. There *was* no impropriety.

(*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250], italics in original.) But he may make a statement of this sort if, as here, it is "based solely on the facts of record." (*Ibid.*) There is no reasonable likelihood that the jury understood the words otherwise. Of course, "prosecutors should refrain from expressing personal views which might unduly inflame the jury against the defendant." (*Ibid.*) The views expressed by the prosecutor in this case were not such.[19]

### D. *Instruction on Consciousness of Guilt*

The People requested the court to instruct the jury at the penalty phase, as it had already done at the guilt phase, in accordance with a modified version of CALJIC No. 2.06 (4th ed. 1983 rev.), a pattern instruction dealing with consciousness of guilt on the part of a defendant as revealed by efforts to suppress evidence. Defendant objected.

The court stated: ". . . I don't have a clear feeling about how much is consciousness of guilt of the crimes of which he's just been convicted have [*sic*] to do with the penalty phase."

The prosecutor responded: "The problem is the jury is intended to consider the facts and circumstances of that crime and its surroundings in determining what penalty ought to be appropriate here. And the fact that he didn't turn himself in to the police immediately but instead tried to avoid being caught for the crime, I think, is something that the jury can well consider in determining what his penalty ought to be."

The court then declared that it would give the instruction. It stated: "I guess there is no other pidgeon [*sic*] hole to put that in other than consciousness of guilt. I don't dispute the proposition that is relevant to penalty. Consciousness of guilt may be [*sic*] just isn't the best label to add on."

Subsequently, the court instructed the jury that "If you find that a defendant attempted to suppress evidence against himself in any manner, such as by an offer to compensate a witness, by destroying evidence, or by concealing evidence, such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However[,] such[] evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration."

---

[19]Defendant generally claims that defense counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object to the various instances of "misconduct." (Compare fn. 18, *ante.*) Further, he generally claims that the court committed error apparently under California law by neglecting to prevent or cure the "harm" arising therefrom *ex proprio motu.* (Compare *ibid.*) There *was* no impropriety.

Defendant also claims that the various instances of "misconduct" entailed the violation of both California law and the United States Constitution. Again, there *was* no impropriety.

 Defendant now contends that the court erred by instructing as it did. We agree.

It is error for a court to give an "abstract" instruction, i.e., "one which is correct in law but irrelevant[.]" (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2950, p. 3624.) Plainly, the advisement here was legally sound. But as the court itself all but concluded, it was inapplicable. Its purpose is to offer the jury guidance in determining guilt. By the time it was delivered, the panel had already decided the question; it no longer needed assistance.[20] Contrary to the People's position here and below, the instruction did not adequately focus on the circumstances of the present offenses or any other issue material to penalty.

We turn from the fact of error to its consequences. "[I]n most cases the giving of an abstract instruction is only a technical error which does not constitute ground for reversal." (5 Witkin & Epstein, Cal. Criminal Law, *supra*, Trial, § 2950, p. 3624.) This is such a case. The jurors here must have understood the instruction in accordance with the common meaning of its plain words, judged it to be mere surplusage, and passed over it without further thought. Certainly, they could not have been led to give undue weight to defendant's efforts to suppress evidence.

Against our conclusion, defendant claims that reversal is required. For argument's sake only, we shall assume the validity of his major premise— that an abstract instruction that misleads the jury may cause prejudice. But we cannot accept the soundness of his minor premise—that the instruction here may have actually misled the jurors. The argument is that the language in question might have been understood by the jury to allow consideration of "aggravating" circumstances beyond those permitted by the law. There is simply no reasonable likelihood of such a result. (*People* v. *Clair, supra,* 2 Cal.4th at pp. 662-663 [stating the "reasonable likelihood" standard as the test for determining whether the jury misconstrued or misapplied an instruction].) The common meaning of the plain words stands in the way. Hence, there is no reasonable possibility that the error affected the outcome. (E.g., *People* v. *Ashmus* (1991) 54 Cal.3d 932, 965 [2 Cal.Rptr.2d 112, 820 P.2d 214] [stating the "reasonable possibility" standard as the test for assessing prejudice for state law error bearing on penalty in a capital case].)[21]

---

[20]It is true that at the penalty phase, the jury was required to determine whether defendant was "guilty" of certain "other crimes." But the record does not reveal any efforts to suppress evidence as to such offenses.

[21]Defendant claims that by instructing as it did, the court committed error not only under California law, but also under the United States Constitution, including the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth

### E. *Constitutionality of the 1978 Death Penalty Law*

■ Defendant contends that the 1978 death penalty law is facially invalid under the United States and California Constitutions, and hence that the judgment of death entered pursuant thereto is unsupported as a matter of law. "[A]s a general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. In his argument here, defendant raises certain specific constitutional challenges. But . . . in the . . . series of cases [beginning with *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 (230 Cal.Rptr. 667, 726 P.2d 113)], we have rejected each and every one. We see no need to rehearse or revisit our holdings or their underlying reasoning." (*People* v. *Ashmus, supra,* 54 Cal.3d at pp. 1009-1010; accord, *People* v. *Clair, supra,* 2 Cal.4th at p. 691.)[22]

## V. DISPOSITION

Having found no reversible error or other defect, we conclude that the judgment must be affirmed.

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied February 10, 1993.

---

Amendment. For the reasons stated above, we believe that the instruction did not substantially implicate any federal constitutional guaranty.

[22]We declare that "Whether or not expressly discussed, we have considered and rejected . . . all of the assignments of error presented in all of defendant's briefs." (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1252 [283 Cal.Rptr. 144, 812 P.2d 163].)

Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, Marion R. within the meaning of *Enmund* v. *Florida, supra,* 458 U.S. 782, 788-801 [73 L.Ed.2d at pp. 1145-1154]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment to the United States Constitution. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)