**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUY KEVIN ROWLAND,
*Petitioner-Appellant*,

v.

KEVIN CHAPPELL, Warden,
*Respondent-Appellee.*

No. 12-99004

D.C. No.
3:94-cv-03037-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted October 4, 2017
Seattle, Washington

Filed December 6, 2017

Before: Kim McLane Wardlaw, Richard R. Clifton,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of California state prisoner Guy Kevin Rowland's 28 U.S.C. § 2254 habeas corpus petition challenging his conviction for first degree murder and rape and his capital sentence.

The panel rejected Rowland's contention that AEDPA, and its highly deferential standard, does not apply to his case because he filed a request for appointment of counsel and a stay of execution before AEDPA's effective date.

The panel held that Rowland's trial attorneys were deficient by retaining a psychiatrist for the penalty phase only a few days before its start and by failing to prepare him adequately, and it would be unreasonable for the California Supreme Court to conclude otherwise. Under AEDPA's highly deferential standard of review, the panel held that the California Supreme Court could have reasonably concluded that Rowland was not prejudiced.

The panel held that the California Supreme Court reasonably decided that Rowland's counsel's failure to call as a witness at the penalty phase the woman to whom Rowland confessed did not amount to deficient performance, and that even if counsel's performance was deficient, the California Supreme Court reasonably decided that Rowland had not shown prejudice.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel wrote that two statements by the prosecutor at the penalty-phase closing argument were inappropriate, but that, applying AEDPA's extreme deference, the California Supreme Court reasonably determined that neither statement violated Rowland's constitutional rights.

The panel held that the California Supreme Court's rejection of Rowland's non-concurrent representation conflict claim was neither contrary to, nor an unreasonable application of, established federal law. The panel wrote that even if successive representation could constitute an actual conflict under established federal law, Rowland has not demonstrated that any conflict due to his counsel's personal and professional relationship with a chief investigating officer significantly affected counsel's performance.

The panel declined to expand the certificate of appealability to include an unexhausted claim that systemic delay in the administration of California's death penalty renders executions arbitrary in violation of the Eighth Amendment.

## COUNSEL

Joel Levine (argued), Costa Mesa, California; Michael Robert Levine (argued), Levine & McHenry LLC, Portland, Oregon; for Petitioner-Appellant.

Alice B. Lustre (argued), Deputy Attorney General; Glenn R. Pruden, Supervising Deputy Attorney General; Gerald A. Engler, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

**OPINION**

OWENS, Circuit Judge:

California state prisoner Guy Kevin Rowland appeals from the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging his conviction for first degree murder and rape and his capital sentence. We affirm.

## I.  BACKGROUND

### A. Factual and Procedural History

On February 11, 1987, the State of California filed an amended information charging Rowland with one count of first degree murder (with the special circumstance that the murder took place during the commission of rape) and one count of rape. It alleged that Rowland had twelve prior felony convictions, and that he was on parole when he committed the offense.

On May 13, 1988, after the guilt phase of the trial, the jury convicted Rowland of both first degree murder and rape, and also found true the special circumstance allegation. On June 6, 1988, after the penalty phase, the jury returned a death sentence.

#### 1.  Guilt Phase Evidence

Evidence at trial established that on March 16, 1986, Marion Geraldine ("Geri") Richardson went to the "Wild Idle" bar in Byron, Contra Costa County, California. Richardson lived in Byron with her mother and worked as a cook. She regularly snorted methamphetamine and evidently had some with her that night.

Rowland, who was twenty-four years old at the time, was also at the bar. Rowland socialized with Richardson for a while. According to an off-duty bartender, Rowland was "coming on" to Richardson, but she did not respond positively and seemed to be "trying to ignore" him.

Before 10 p.m., Rowland left the bar alone, driving away in his truck. Sometime later, Richardson told her friend that she was not feeling well, had a terrible headache, and needed to go home to get some sleep as she had to go to work early the next morning. Richardson left the bar alone in her car. Her car was later seen parked, empty and unlocked, at an odd angle about half a block from the bar.

In the hours that followed, Rowland brutally beat Richardson about the head, face, and elsewhere. He also raped her. According to expert testimony, Richardson had a bruise on her inner thigh which could have been caused by someone using a knee to force her legs part. Rowland also choked Richardson twice, killing her the second time. Before her death, Richardson ingested a potentially lethal dose of methamphetamine, which it appeared Rowland put in her mouth. Rowland then hauled Richardson's body in his truck to Half Moon Bay in San Mateo County, dragged her on the ground, and dumped her in the ocean.

The next morning, at about 7 a.m., Rowland went to the house of his lover, Susan Lanet, in Livermore. He looked disturbed and said he wanted to leave California. They shared some methamphetamine he had evidently taken from Richardson. Rowland soon admitted to Lanet that he had killed Richardson. He asked Lanet whether she wanted Richardson's belongings, including a ring and make-up. Lanet declined. Rowland then offered Lanet $20 to clean his truck and remove "[b]lood and every strand of hair." Lanet pretended to accept, but instead called the police. Shortly

thereafter, Rowland was arrested as he attempted to flee.  At around 9:45 a.m., Richardson's body was found at the base of a cliff by Moss Beach near Half Moon Bay.  Blood and other evidence in Rowland's truck tied him to Richardson's killing.

At the guilt phase of the trial, Rowland did not present any evidence, call any witnesses, or take the stand.  His primary defense was that the evidence did not establish first degree murder or rape.  The jury returned a guilty verdict.

### 2.  Penalty Phase Evidence

During the penalty phase of the trial, the State offered in aggravation: (1) the circumstances of Rowland's crimes committed against Richardson (for which it relied on the evidence already provided during the guilt phase); (2) Rowland's extensive prior violent criminal activity; and (3) Rowland's prior felony convictions.

As the State demonstrated to the jury, Rowland had an egregious history of violence towards women:

- On April 4, 1978, Rowland entered the home of a sixty-three-year-old woman, whom he battered while he attempted to escape.  She suffered a crushed vertebra and was hospitalized for eleven days.

- On October 4, 1980, Rowland lured a twenty-six-year-old woman out of a bar to a park with an offer to share cocaine, and then assaulted, battered, and raped her.

- On November 7, 1980, Rowland, together with a male partner, kidnapped two thirteen-year-old girls, whom they lured into a truck with a false offer of a

ride. One girl escaped, but the two men raped the other girl multiple times. Rowland helped his partner rape the girl twice. Rowland himself raped her six times, caused her to orally copulate him, sodomized her twice, and fondled her. During the attack, he repeatedly threatened to kill the girl if she resisted.

- On March 11, 1986 (a few days before Richardson's murder), Rowland assaulted his stepsister with a knife and threatened to kill her. Their dispute involved the locking of a door, but the underlying cause was apparently her antagonistic response to his expressed romantic interest.

- Also on March 11, 1986, Rowland assaulted, threatened to kill, and may have raped a woman. After Rowland, Lanet, and the woman used methamphetamine together, Rowland offered to drive the woman home. Instead, he drove her to the top of a cliff that loomed over a body of water. At the cliff, he pulled her out of the car, beat her, and said he was going to kill her and throw her body off the cliff. He told her to undress and she complied. He continued to beat and choke her, and may have raped her. He then drove her to his mother's house, where he kept her in the bathroom against her will. Rowland called Lanet and admitted what he had done. Rowland asked the woman to hold off calling the police, and then he fled.

As to Rowland's prior felony convictions, the State established that Rowland was convicted of multiple counts of kidnapping, rape, sodomy, and other felonies for the vicious attack on the thirteen-year-old girls.

In mitigation, Rowland himself did not testify, but he presented evidence of his family background, including physical abuse and alcoholism. He was born into a middle class family in 1961, and had one brother and two sisters. His parents had a violent, alcoholic marriage. His mother neglected and abused him, and twice attempted to drown him in the bathtub as a baby. As a toddler, he experienced night terrors and convulsions. At a young age, he commenced psychotherapy and drug therapy. In school, he had learning disabilities and behavioral problems. He started to abuse alcohol and drugs, and proceeded to spend substantial time in correctional facilities.

Rowland was diagnosed with different mental conditions at various points in his life. For example, when he was six or seven years old, he was diagnosed with hyperactivity. At the time of trial, when he was twenty-six, Rowland was diagnosed with borderline personality disorder. As discussed further below, psychiatrist Dr. Hugh Ridlehuber testified for Rowland at the penalty phase.

Rowland also offered the background of his family members as mitigation evidence. His parents each came from violent, sexually abusive, alcoholic backgrounds. Rowland's parents physically and/or sexually abused his sister, and Rowland's father abused his mother.

The jury returned a death sentence.

## B. Post-Conviction Proceedings

On December 17, 1992, the California Supreme Court affirmed Rowland's conviction and death sentence. *See People v. Rowland*, 841 P.2d 897 (Cal. 1992).

On March 7, 1994, Rowland filed his first habeas petition in the California Supreme Court. His state habeas petition was accompanied by supporting declarations, including from Dr. Ridlehuber, who had testified for Rowland in the penalty phase and now declared that he had been hired by trial counsel "too late" to do an adequate examination. The California Supreme Court summarily denied the petition on the merits on June 1, 1994.

On August 26, 1994, Rowland filed a motion in federal district court requesting appointment of counsel and a stay of execution pending preparation of his finalized habeas petition. On June 19, 1995, after counsel was appointed, Rowland filed a motion for a further stay of execution, which was accompanied by a partial list of non-frivolous issues to be raised in the finalized petition. On June 28, 1996, after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Rowland filed his finalized habeas petition.

Rowland ultimately filed his operative third amended habeas petition on November 19, 2007. On October 2, 2012, the district court granted summary judgment in favor of the State. The district court rejected Rowland's argument that AEDPA does not apply to his case. The district court also denied a certificate of appealability ("COA") on all of Rowland's claims.

Rowland then filed a timely appeal, and our court granted a COA on a number of issues.

## II. STANDARD OF REVIEW

We review de novo a district court's denial of a habeas petition and for clear error any factual findings made by the

district court.  *Hurles v. Ryan*, 752 F.3d 768, 777 (9th Cir. 2014).

Under AEDPA, when a state court has decided a claim on the merits, we may grant relief only if the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

This standard is "highly deferential" and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102, 105 (2011) (citations omitted).  It "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  AEDPA "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (citation omitted).  An unreasonable application of clearly established federal law must be "objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citation omitted).  "Rather, '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (citation omitted).

Here, the California Supreme Court provided reasoned decisions for denying some of Rowland's claims, but

summarily denied others. For those claims where the state court provided an adjudication on the merits, but without any underlying reasoning, we must conduct an independent review of the record to determine whether the state court's final resolution of the case constituted an unreasonable application of clearly established federal law. *See Greene v. Lambert*, 288 F.3d 1081, 1088–89 (9th Cir. 2002). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## III. DISCUSSION

### A. AEDPA Applies to Rowland's Federal Habeas Petition

We first address AEDPA's application here. Rowland contends that AEDPA is inapplicable because on August 26, 1994, before AEDPA's effective date, he filed a request for appointment of counsel and a stay of execution. At the time, a Northern District of California local rule stated that such a motion "shall be deemed to be a petition for writ of habeas corpus with leave having been granted to amend the petition upon appointment of counsel." N.D. Cal. R. 296-8(b) (1990). On the district court docket, "COURT STAFF" labeled the entry as "PETITION FOR WRIT OF HABEAS CORPUS."

Also before AEDPA's effective date, on June 19, 1995, Rowland's newly appointed counsel filed an application for a stay of execution to permit preparation of a habeas petition, which included a partial list of non-frivolous issues to be raised in the petition. Again, at the time, the local rule stated that "[i]f no filing was made under paragraph 8(b) above, the

specification of nonfrivolous issues required [for a new counsel's application for a temporary stay of execution] shall be deemed to be a petition for writ of habeas corpus with leave having been granted to amend the petition." N.D. Cal. R. 296-8(c) (1990).

AEDPA took effect on April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 327 (1997) (holding that AEDPA does not apply to cases "pending" in federal court on AEDPA's effective date). On June 28, 1996, Rowland filed his actual habeas petition seeking adjudication on the merits of his claims. Nonetheless, Rowland argues AEDPA does not govern his petition because of his pre-AEDPA request for appointment of counsel and a stay of execution.

The Supreme Court has rejected a similar argument. *Woodford v. Garceau* holds that AEDPA applies to a habeas petition filed after AEDPA's effective date, even if the petitioner sought the appointment of counsel and/or a stay of execution before AEDPA's effective date. 538 U.S. 202, 205–06 (2003). The Supreme Court reasoned that:

> [W]hether AEDPA applies to a state prisoner turns on what was before a federal court on the date AEDPA became effective. If, on that date, the state prisoner had before a federal court an application for habeas relief seeking an adjudication on the *merits* of the petitioner's claims, then amended § 2254(d) does not apply. Otherwise, an application filed after AEDPA's effective date should be reviewed under AEDPA, even if other filings by that same applicant—such as, for example, a request for the appointment of counsel or a motion for a stay of execution—

were presented to a federal court prior to AEDPA's effective date.

*Id*. at 207 (emphasis in original). The Court also noted that a filing labeled "Specification of Non-Frivolous Issues" was insufficient to "place the merits of respondent's claims before the District Court for decision" because "the document simply alerted the District Court as to some of the possible claims that might be raised by respondent in the future." *Id*. at 210 n.1. Thus, the Court concluded that for AEDPA purposes "a case does not become 'pending' until an actual application for habeas corpus relief is filed in federal court." *Id*. at 210.

Rowland argues that *Garceau* is distinguishable because his pre-AEDPA request for appointment of counsel and stay of execution was "deemed to be a petition for writ of habeas corpus" under the local rule and designated on the docket as a "PETITION FOR WRIT OF HABEAS CORPUS." But under *Garceau*, even if his pre-AEDPA filings are considered a "petition for writ of habeas corpus," they are insufficient to preclude AEDPA's application because they did not place the "merits" of Rowland's claims before the district court for adjudication. 538 U.S. at 207, 210 n.1. Thus, *Garceau* controls here.[1]

---

[1] We are also unpersuaded by Rowland's argument that AEDPA does not apply because he relied in good faith on the district court's local rule and docket entry which deemed his pre-AEDPA motion a petition for writ of habeas corpus. An exception to good faith reliance exists where a court lacks the power or discretion to take the action in question, and Rowland provides no authority that would grant a court the power to change AEDPA's statutorily mandated standard of review. *See Perry v. Brown*, 667 F.3d 1078, 1087 n.6 (9th Cir. 2012). Further, it would have

Accordingly, we conclude that AEDPA, and its highly deferential standard of review, applies to Rowland's case.

## B.  Ineffective Assistance of Counsel at Penalty Phase

Rowland argues that his attorneys were ineffective at the penalty phase by failing to: (1) adequately prepare psychiatrist Dr. Ridlehuber; and (2) call Lanet as a witness. To prevail, Rowland must show both that his counsel was deficient and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  Deficient performance requires showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  Prejudice requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The standards created by *Strickland* and AEDPA "are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal citations omitted).  Thus, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

### 1.  Inadequate Preparation of Psychiatrist Dr. Ridlehuber

Rowland contends that his trial attorneys contacted Dr. Ridlehuber, a psychiatrist who testified at the penalty phase, "too late" to perform an adequate evaluation and failed to provide him with important medical records about Rowland's "traumatic birth," and that as a result mitigating

---

been unreasonable for Rowland to rely on the local rule, which preceded AEDPA by six years, to avoid AEDPA's application.

psychiatric evidence was not discovered or presented. Rowland raised this claim in his first state habeas petition, which the California Supreme Court summarily denied. Therefore, we must independently review the record to determine the reasonableness of the California Supreme Court's decision. *See Greene*, 288 F.3d at 1088–89.

### a. Background

Some background helps put this claim in context. Rowland's counsel began consulting mental health professionals almost two years before Rowland's trial. In May 1986, defense counsel retained a psychiatrist who examined Rowland, but concluded that there was no viable mental defense in the guilt phase. In August 1986, defense counsel also retained a psychologist, who conducted psychological testing of Rowland. In addition, defense counsel sent an investigator to interview a mental health professional who had treated Rowland at the California Medical Facility.

Defense counsel initially retained psychiatrist Dr. Ridlehuber in February 1988 (approximately one month before the guilt phase trial), to evaluate Rowland for Attention Deficit Disorder ("ADD") at the suggestion of the other mental health experts. Dr. Ridlehuber examined Rowland for four hours, and could not substantiate that he had ADD.

Rowland's trial began in March 1988. None of the doctors testified for Rowland in the guilt phase.

Rowland was convicted on May 13, 1988, and then the penalty phase began less than two weeks later on May 23. On May 18, a few days before the penalty phase began, defense counsel contacted Dr. Ridlehuber, informed him

that Rowland had been found guilty, and asked if he would be able to testify as to the effect of Rowland's childhood circumstances on his adult personality. Defense counsel spoke with Dr. Ridlehuber again on May 22, and then the two consulted with another psychiatrist for two hours on May 23. According to Dr. Ridlehuber's declarations, between May 21 and May 30, "while the penalty phase trial was already in progress," he performed a "more expansive, however still inadequate, evaluation of Mr. Rowland consisting of 14 hours of interview and nine hours of research, review and analysis." In addition to interviewing Rowland, Dr. Ridlehuber reviewed multiple sources of information, including Rowland's family history, information from a doctor who treated Rowland as a child, reports from a defense investigator who had interviewed a number of Rowland's family members, and Rowland's treatment in the California Medical Facility.

On May 31, 1988, Dr. Ridlehuber testified for Rowland at the penalty phase. Dr. Ridlehuber opined that Rowland suffered from a borderline personality disorder, "a major psychiatric disorder [that] can be just as disruptive as schizophrenia." But, he also testified that he found no evidence of organic brain dysfunction or schizophrenia. In addition, Dr. Ridlehuber testified that Rowland was very vulnerable to rejection and his ability to handle interpersonal relationships was severely impaired because of his abusive and traumatic childhood. In his closing, the prosecutor argued that the jury should "totally reject" Dr. Ridlehuber's opinion because his report had been "rushed together in a week."

Two Dr. Ridlehuber declarations supported Rowland's first state habeas petition. Dr. Ridlehuber stated that defense counsel contacted him "too late" in the proceedings to

evaluate Rowland adequately. He stated that the "time constraints under which [he] was working made it virtually impossible to conduct anything other than the most general type of testing." He also stated that he did not have Rowland's complete medical records, particularly a medical history form completed by Rowland's mother when Rowland was ten years old, which noted that within the first four weeks of life he had "jaundice, blood transfusion, convulsions, and an infection."

Based on information he did not have at the time of trial, such as the circumstances of Rowland's "traumatic birth," Dr. Ridlehuber now thought there was a "very high probability" that Rowland did have an organic brain condition, "possib[ly]" Bipolar Affective Disorder, "probably" fetal distress syndrome, and "quite possibly" Attention Deficit Hyperactivity Disorder, Adult Residual Form. Dr. Ridlehuber stated that if he had this additional information, he would have performed further tests to determine whether Rowland had organic brain damage. For example, Dr. Ridlehuber now thought that Rowland "may" have had damage in the "frontal lobe area of the brain," which he did not test at the time of trial.

### b. Analysis

"To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 399 (2000)). And, failure to timely prepare for the penalty phase can constitute deficient performance. *See Williams*, 529 U.S. at 395 (holding that counsel was deficient at the penalty phase because he did not begin preparing until

"a week before the trial" and failed to uncover records of the petitioner's "nightmarish childhood"); *Jells v. Mitchell*, 538 F.3d 478, 493–94 (6th Cir. 2008) (holding that "[t]he failure of [the petitioner's] trial counsel to begin mitigation preparations prior to the end of the culpability phase of [the] trial was objectively unreasonable under *Strickland*").

Rowland's trial attorneys were deficient by retaining Dr. Ridlehuber for the penalty phase only a few days before its start and by failing to prepare him adequately, and it would be unreasonable for the California Supreme Court to conclude otherwise. *See Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (holding that counsel was deficient by delaying preparing penalty phase mitigating evidence, including not contacting a mental health expert "to prepare him for the penalty phase until a day or two before his testimony"); *Bloom v. Calderon*, 132 F.3d 1267, 1277–78 (9th Cir. 1997) (holding that counsel was deficient by failing to obtain a psychiatric expert until days before trial, and then failing to adequately prepare the expert); *see also Bond v. Beard*, 539 F.3d 256, 288 (3d Cir. 2008) (holding that counsel was deficient in part because they "waited until the eve of the penalty phase to begin their preparation" which caused them to "fail[] to give their consulting expert sufficient information to evaluate [the petitioner] accurately," and noting that under the professional norms established by the American Bar Association, a mitigation investigation should begin immediately and expeditiously).

Rowland's counsel's retention of mental health experts for the guilt phase, including a brief evaluation of Rowland by Dr. Ridlehuber for ADD, does not excuse their delay in retaining an expert for the penalty phase. *See Doe v. Ayers*, 782 F.3d 425, 441 (9th Cir. 2015) ("Hiring an expert to evaluate possible guilt-phase mental-state defenses does not

discharge defense counsel's duty to prepare for the penalty phase."); *Hendricks v. Calderon*, 70 F.3d 1032, 1043–44 (9th Cir. 1995) ("[I]t does not follow that an investigation sufficient to foreclose the possibility of a mental defense necessarily forecloses the possibility of presenting evidence of mental impairment as mitigation in the penalty phase.").

Further, Rowland's counsel's tardy retention of Dr. Ridlehuber opened up the prosecutor's attack that Dr. Ridlehuber's report had been "rushed together in a week" and therefore the jury should "totally reject" his opinion. *See Hovey v. Ayers*, 458 F.3d 892, 928 (9th Cir. 2006) (holding that counsel was deficient at the penalty phase in part by failing to adequately prepare a psychiatric expert which "would have prevented the prosecutor from portraying [the expert] as ill-prepared and foolish and thereby impugning his medical conclusions").

But to prevail, Rowland must show that Dr. Ridlehuber's testimony and report, prepared with sufficient time and resources, would satisfy the onerous AEDPA standard for a claim of ineffective assistance of counsel. He cannot. Under AEDPA's highly deferential standard of review, the California Supreme Court could have reasonably concluded that Rowland was not prejudiced by his counsel's deficient preparation of Dr. Ridlehuber for the penalty phase. Dr. Ridlehuber merely speculates that Rowland possibly has organic brain damage and other mental health conditions. The California Supreme Court could have reasonably determined that the limited value of additional testimony from Dr. Ridlehuber about Rowland's mental diagnoses would not have changed the outcome of the penalty phase when weighed against the aggravating evidence of Rowland's brutal rape and murder of Richardson, and Rowland's egregious criminal record of multiple sexual

assaults and violent attacks, including repeatedly raping a kidnapped 13-year-old girl. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *see also Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (per curiam) (holding in a capital case that there was no prejudice due to counsel's failure to introduce more mitigating evidence because the aggravating evidence was "simply overwhelming" (citation omitted)).

Thus, giving the California Supreme Court the "benefit of the doubt" as we must under AEDPA, it reasonably rejected Rowland's ineffective assistance of counsel claim regarding the preparation of Dr. Ridlehuber for the penalty phase. *Visciotti*, 537 U.S. at 24. Accordingly, we affirm the district court's denial of relief on this claim.

### 2. Not Calling Lanet as a Witness at the Penalty Phase

Rowland argues that he was denied effective assistance of counsel because his attorneys failed to call Lanet (the woman he confessed to) to testify at the penalty phase about Rowland's statements describing his argument with Richardson before he killed her. He contends that such evidence would have shown that he killed Richardson after an argument about drugs and her negative opinion of felons, rather than as part of a rape.

The California Supreme Court denied this claim in a reasoned decision on direct appeal:

> Counsel's performance was not deficient because the [failure to call Lanet at the penalty phase] was not unreasonable. In view of the evidence concerning the

circumstances of the present offenses adduced at the guilt phase, counsel could properly have declined to reopen the matter—especially through a self-serving, out-of-court statement by defendant. Moreover, even if counsel's performance had been deficient, it could not have subjected defendant to prejudice. There is no reasonable probability that the introduction of a statement of the sort here would have affected the outcome.

*Rowland*, 841 P.2d at 920 (footnote omitted).

Rowland contends that Lanet's testimony was critical mitigating evidence because it would have explained his motive for killing Richardson, cast doubt on whether the murder occurred in the course of a rape, and showed that he was not a wanton murderer deserving death. He notes that the trial judge acknowledged, in making an evidentiary ruling during the guilt phase, that Rowland's statements would "certainly, arguably . . . tend to support perhaps a second degree murder, perhaps even a manslaughter finding" because they "could be urged as a sudden quarrel, support of that sort of theory."

Rowland further contends that his trial counsel had no strategic reason for failing to call Lanet as a witness at the penalty phase. He concedes that it was reasonable at the guilt phase for trial counsel, when cross-examining Lanet, not to elicit testimony regarding Rowland's statements about the argument because it would have allowed the State to introduce rebuttal evidence of Rowland's prior criminal record. But, the argument goes, this strategic reason would not apply to the penalty phase because the State already had

introduced Rowland's prior criminal record as aggravating evidence.

However, the California Supreme Court reasonably decided that Rowland's counsel's performance was not deficient because his counsel could have made a strategic decision to omit Lanet's testimony at the penalty phase. *See Strickland*, 466 U.S. at 689 (to show deficiency, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "might be considered sound trial strategy" under the circumstances (citation omitted)). For example, his counsel may have reasonably concluded that it would be harmful at the penalty phase to recall Lanet and revisit the circumstances of Rowland's brutal crime. In addition, even if his counsel's performance were deficient, the California Supreme Court reasonably decided that Rowland had not shown prejudice because there is no reasonable probability that the limited value of Lanet's testimony would have changed the outcome of the penalty phase, especially in light of his monstrous criminal history. *See id*. at 694.

Accordingly, we affirm the district court's denial of relief on this claim.

### C.  Prosecutor's Statements at Penalty Phase Closing Argument

Rowland challenges two of the prosecutor's statements made in the penalty phase. While both statements were inappropriate, we conclude that, applying AEDPA's extreme deference, the California Supreme Court reasonably determined that neither statement violated Rowland's constitutional rights.

### 1.  Personal Opinion About the Death Penalty

Rowland argues that the prosecutor violated due process during his closing argument when he expressed his personal belief that he would vote for the death penalty if he were on the jury.  Specifically, the prosecutor stated in his summation asking the jury to impose the death penalty that "[I] never [] ask others to do what I would not feel is right, and what I would not do myself" and "I would not ask you to do something that I would not do."  Defense counsel asked "the court to admonish the jury that they should not consider [the prosecutor's] personal feelings in arriving at the appropriate penalty," which the trial court refused to do.

The California Supreme Court denied this claim in a reasoned decision on direct appeal:

> We agree [with the trial court].  True, a prosecutor may not "state his personal belief regarding . . . the appropriateness of the death penalty, *based on facts not in evidence*." (*People v. Ghent* (1987) 43 Cal. 3d 739, 772, 239 Cal. Rptr. 82, 739 P.2d 1250, italics in original).  But he may make a statement of this sort if, as here, it is "based solely on the facts of record."  (*Ibid*.)  There is no reasonable likelihood that the jury understood the words otherwise.  Of course, "prosecutors should refrain from expressing personal views which might unduly inflame the jury against the defendant." (*Ibid*.)  The views expressed by the prosecutor in this case were not such.

*Rowland*, 841 P.2d at 924.

Like the district court, we disapprove of the prosecutor's comments, but conclude that the California Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law, nor was it an unreasonable determination of the facts.

A prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* (internal quotation marks and citation omitted).

Rowland contends that under Supreme Court precedent, a prosecutor may not express his personal beliefs, irrespective of its basis on evidence in the record, because "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985). However, in *Young* itself, the Court concluded that "[a]lthough it was improper for the prosecutor to express his personal opinion about respondent's guilt," the remarks did not "undermine the fairness of the trial and contribute to a miscarriage of justice" and thus did not require reversal.[2] *Id.*

---

[2] Rowland also cites *Berger v. United States*, 295 U.S. 78, 88 (1935), which noted that "improper suggestions, insinuations, and, especially, assertions of personal knowledge [by the prosecutor] are apt to carry much weight against the accused when they should properly carry none." But, *Berger* is different. There, the prosecutor made improper statements that referred to his personal knowledge based on evidence outside the record, which required reversal because the case against the defendant was weak and the prosecutor's misconduct was not "slight or confined to a single instance, but . . . pronounced and persistent, with a probable

at 19–20.  Likewise here, the prosecutor's improper remarks expressing his personal opinion about the appropriateness of the death penalty for Rowland did not undermine the fundamental fairness of the trial.

Rowland also relies on *Weaver v. Bowersox*, 438 F.3d 832, 840–41 (8th Cir. 2006), in which the Eighth Circuit held that a petitioner was entitled to habeas relief based in part on the prosecutor's improper statements during closing argument in the penalty phase "about his personal belief in the death penalty."  *Weaver* reasoned that "[s]tatements about the prosecutor's personal belief in the death penalty are inappropriate and contrary to a reasoned opinion by the jury," and noted that "[a] prosecutor should not emphasize his or her position of authority in making death penalty determinations because it may encourage the jury to defer to the prosecutor's judgment."  *Id*.; *see also Bates v. Bell*, 402 F.3d 635, 644 (6th Cir. 2005) ("In the capital sentencing context, prosecutors are prohibited from expressing their personal opinion as to the existence of aggravating or mitigating circumstances and the appropriateness of the death penalty.  Jurors are mindful that the prosecutor represents the State and are apt to afford undue respect to the prosecutor's personal assessment.").

Here, however, the prosecutor's statements that "[I] never [] ask others to do what I would not feel is right, and what I would not do myself" and "I would not ask you to do something that I would not do" do not rise to the level of the statements in *Weaver*.  For example, in *Weaver*, unlike here, the prosecutor made a litany of improper statements, including that that he "had a special position of authority and

---

cumulative effect upon the jury which cannot be disregarded as inconsequential."  *Id*. at 88–89.

decided whether to seek the death penalty."  438 F.3d at 840; *cf. Barnett v. Roper*, 541 F.3d 804, 813 (8th Cir. 2008) (denying habeas relief based on prosecutor's statement during her penalty phase opening argument that "if those [murders] don't [warrant imposition of the death penalty], I don't know what does" because her comment "does not compare in polemical stridency with those [in other cases, including *Weaver*,] and was not so outrageous or prejudicial as to warrant a sua sponte declaration by the trial court of a mistrial, nor did it inject such unfairness into the penalty phase that [the petitioner] was denied due process of law").

Moreover, the Supreme Court has emphasized that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations[.]'"  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (citation omitted).  In *Parker*, the Court reversed the Sixth Circuit's grant of habeas relief based on the prosecutor's alleged violation of *Darden* by suggesting in closing argument that the petitioner had colluded with his counsel and an expert to manufacture an extreme emotional disturbance defense.  *Id*. at 45–48.  The Court held that the Sixth Circuit overlooked the context of the prosecutor's comment, and that "even if the comment is understood as directing the jury's attention to inappropriate considerations, that would not establish that the Kentucky Supreme Court's rejection of the *Darden* prosecutorial misconduct claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Id*. at 47 (citation omitted).  The Court noted that "*Darden* itself held that a closing argument considerably more inflammatory than the one at issue here did not warrant habeas relief."  *Id*. at 47–48 (citing *Darden*, 477 U.S. at 180 n.11 (prosecutor referred to the defendant as an "animal"); *id*. at 180 n.12 ("I wish I could

see [the defendant] with no face, blown away by a shotgun")). Thus, the Court concluded that "the Sixth Circuit had no warrant to set aside the Kentucky Supreme Court's conclusion." *Id.* at 48.

Here, the California Supreme Court's rejection of Rowland's *Darden* claim based on the prosecutor's statements expressing his personal opinion about the appropriateness of the death penalty was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 47 (citation omitted).

Furthermore, any prosecutorial misconduct amounting to a constitutional violation was harmless because it did not have a "substantial and injurious effect" on the jury's verdict for death. *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004) ("Even if a state court decision is 'contrary to' or 'involved an unreasonable application of' clearly established federal law, a habeas court may grant relief only if petitioner shows that the error had a 'substantial or injurious effect' on the verdict." (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). Rowland's egregious criminal history spoke louder than anything the prosecutor said.

Accordingly, we affirm the district court's denial of relief on this claim.

### 2. California Voters' Approval of the Death Penalty

Rowland also contends that the prosecutor committed *Caldwell* error and violated due process by referencing California voters' "overwhelming" support for the death penalty and the ouster of three California Supreme Court justices because they failed to enforce the death penalty.

The California Supreme Court denied this claim in a reasoned decision on direct appeal:

> [D]efendant complains of certain unobjected-to comments in the prosecutor's summation that allegedly misled the jury on its role in determining penalty.
>
> In context, the message the prosecutor delivered was this: the jurors' function was judicial, not legislative; they had to decide whether the death penalty was the appropriate punishment in this case, not whether it should be available as a sanction in general.  That message, of course, was altogether sound.
>
> We do not overlook—and certainly do not approve—such remarks as this: "We had a recent election in which several of our Supreme Court justices were perceived by the voters not to be applying [the death penalty] law.  They are gone now.  There's no question that it is the policy expressed by the will of the populace that there be a death penalty in California, and that it be carried out in appropriate cases."  Or this: "[T]he voters overwhelmingly approved the death penalty. . . ."
>
> Nevertheless, there is no reasonable likelihood that the jury understood the challenged remarks as defendant asserts—and surely not in such a way as to "minimize [its] sense of responsibility for determining

the appropriateness of death" in violation of the Eighth Amendment to the United States Constitution as construed in *Caldwell v. Mississippi* (1985) 472 U.S. 320, 341.

*Rowland*, 841 P.2d at 921–22 (parallel citations omitted).

Again, while we disapprove of the prosecutor's comments, we conclude that the California Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law, nor was it an unreasonable determination of the facts.

In *Caldwell*, the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328–29. The Court vacated the death sentence because the prosecutor had improperly "sought to minimize the jury's sense of responsibility for determining the appropriateness of death" by leading the jury "to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." *Id.* at 323, 341.

Rowland argues that the prosecutor's comments violated *Caldwell* because they led the jury to believe that responsibility for determining the appropriateness of his death sentence rested not with the jury but with the voters of California who had overwhelmingly approved the death penalty. However, under AEDPA's highly deferential standard of review, the California Supreme Court reasonably determined that there was no *Caldwell* error because, in context, the prosecutor's remarks did not "minimize the jury's responsibility for determining the appropriateness of

death," but rather conveyed that the jury's responsibility was not to determine whether the death penalty should be available as a sanction in general.  472 U.S. at 341; *cf. Campbell v. Kincheloe*, 829 F.2d 1453, 1460–61 (9th Cir. 1987) (holding that the prosecutor's remark that it was not the jury's duty to "debate the death penalty" was merely a "general comment on the validity of the death penalty per se" and did not constitute *Caldwell* error).  Nor did the prosecutor's comments, even if they were "undesirable" or "universally condemned," "so infect[] the trial with unfairness as to make the resulting [death sentence] a denial of due process."  *Darden*, 477 U.S. at 181 (citations omitted).  And, again, any prosecutorial misconduct amounting to a constitutional violation was harmless because it did not have a "substantial and injurious effect" on the jury's verdict for death.  *Parle*, 387 F.3d at 1044.

Accordingly, we affirm the district court's denial of relief on this claim.[3]

---

[3] Rowland also argues that his counsel was ineffective by failing to object to the prosecutor's remarks about California voters.  The California Supreme Court denied this claim on the merits in a reasoned decision.  *Rowland*, 841 P.2d at 924 n.19.  This decision was not contrary to, or an unreasonable application of, clearly established United States Supreme Court law, nor was it an unreasonable determination of the facts.  Under the double deference afforded by AEDPA and *Strickland*, Rowland's counsel was not deficient, and Rowland was also not prejudiced by his counsel's failure to object.

Rowland's reliance on *Zapata v. Vasquez*, 788 F.3d 1106 (9th Cir. 2015), is misplaced.  *Zapata* granted habeas relief based on the trial counsel's failure to object to the prosecutor's incorrect, inflammatory, and irrelevant remarks in closing argument.  *See id*. at 1112–17.  This court noted that, in considering whether trial counsel was deficient by failing to object, "our task is made easy because the California Court of

## D. Right to Conflict-Free Counsel

Rowland contends that one of his trial attorneys had an undisclosed conflict of interest. Rowland raised this claim in his first state habeas petition, and the California Supreme Court summarily denied it. Therefore, we must independently review the record to determine whether the California Supreme Court's decision was reasonable. *See Greene*, 288 F.3d at 1088–89.

Specifically, Rowland alleges that his counsel, Charles Pierpoint, had a close personal and professional relationship with Detective Singleton, a chief investigating officer and testifying witness in the case against Rowland. Pierpoint knew Detective Singleton from his time as a Deputy District Attorney in the San Mateo District Attorney's Office. According to Rowland, they remained friends during the time of Rowland's trial. Further, Pierpoint or his legal partner had represented Detective Singleton in several civil suits, including a divorce action. Pierpoint's representation of Detective Singleton terminated before Rowland's trial.

Under the Sixth Amendment, "[w]here a constitutional right to counsel exists, . . . there is a correlative right to representation that is free from conflicts of interest." *Wood*

---

Appeal itself concluded 'the prosecutor committed serious misconduct.'" *Id*. at 1112. However, *Zapata* is distinguishable because here the California Supreme Court did not find that the prosecutor committed "serious misconduct" by making incorrect, inflammatory, and irrelevant remarks. Rather, although it disapproved of the remarks, the California Supreme Court found that the prosecutor's message was "sound" and did not mislead the jury. *Rowland*, 841 P.2d at 921.

Accordingly, we affirm the district court's denial of relief on this claim.

*v. Georgia*, 450 U.S. 261, 271 (1981).  To establish a Sixth Amendment violation based on a conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  An "actual conflict" means "a conflict of interest that adversely affects counsel's performance," rather than "a mere theoretical division of loyalties."  *Mickens v. Taylor*, 535 U.S. 162, 171, 172 n.5 (2002).  When this standard is met, prejudice is presumed because the "assistance of counsel has been denied entirely or during a critical stage of the proceeding."  *Id.* at 166.  In other words, it is an exception to the usual requirement to show *Strickland* prejudice for a Sixth Amendment violation.  *Id*.

Rowland argues that there was an "actual conflict," and thus a presumption of prejudice, based on his attorney Pierpoint's relationship with Detective Singleton.  However, in *Mickens*, the Supreme Court explicitly limited this presumption of prejudice for an actual conflict of interest (also known as the "*Sullivan* exception") to cases involving "concurrent representation."  *Id*. at 175; *see also Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation[.]").  The Court explained that the presumption of prejudice was needed in these situations because of "the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice," and noted that "[n]ot all attorney conflicts present comparable difficulties."  *Mickens*, 535 U.S. at 175.  The Court chastised the circuit courts for applying "*Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,'" invoking it in cases involving former clients and personal or financial interests.  *Id.* at 174 (citation omitted).   The Court explicitly stated that

"[w]hether *Sullivan* should be extended to [successive representation] cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id*. at 176. Accordingly, the Court concluded that the *Sullivan* presumption of prejudice did not apply to a conflict of interest rooted in the petitioner's counsel's previous brief representation of the victim. *See id.* at 164–65, 175–76.

We have held that a state court's rejection of a conflict claim not stemming from concurrent representation is neither contrary to, nor an unreasonable application of, established federal law as determined by the United States Supreme Court. *See, e.g.*, *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007) (holding that the state court did not unreasonably reject a conflict claim because the Supreme Court has not "held that a defendant states a Sixth Amendment claim by alleging that appointed appellate counsel had a conflict of interest due to the defendant's dismissed lawsuit against the public defenders office and appointed pre-trial counsel"); *Earp*, 431 F.3d at 1184 (holding that the state court did not unreasonably reject a conflict claim arising from the petitioner's counsel developing a romantic relationship with the petitioner culminating in their marriage because "[t]he Supreme Court has never held that the *Sullivan* exception applies to conflicts stemming from intimate relations with clients"). Likewise here, the California Supreme Court's rejection of Rowland's non-concurrent representation conflict claim was neither contrary to, nor an unreasonable application of, established federal law.

We acknowledge that we have previously stated that "[i]t is clearly established by Supreme Court precedent that 'successive representation' may pose an actual conflict of interest because it may have an adverse [e]ffect on counsel's

performance." *Alberni v. McDaniel*, 458 F.3d 860, 872, 874 (9th Cir. 2006) (citing *Mickens*, 535 U.S. at 175–76) (remanding for an evidentiary hearing on a conflict claim arising from the petitioner's representation by counsel who cross-examined a prosecution witness who was a former criminal client in a related case and noting that "[s]hould the district court conclude that an actual conflict of interest existed, [the petitioner] need not show prejudice"); *but see id*. at 874–76 (McKeown, J., concurring in part and dissenting in part) (disagreeing with majority relieving the petitioner of showing prejudice for a successive representation claim, "an approach—as explained in *Mickens* []—that has not been established by Supreme Court precedent").**[4]** However, unlike here, *Alberni* did not involve prior representation in unrelated civil matters.

Moreover, even if successive representation could constitute an actual conflict under established federal law, Rowland has not demonstrated that any conflict due to his counsel Pierpoint's relationship with Detective Singleton "significantly affected counsel's performance." *Mickens*, 535 U.S. at 172–73. Rowland argues that "Pierpoint's closing argument—specifically his gratuitous vouching to the jury of Singleton's honesty and integrity—is powerful

---

**[4]** *See also Houston v. Schomig*, 533 F.3d 1076, 1081–83 (9th Cir. 2008) (remanding for an evidentiary hearing on a conflict claim arising from the petitioner's representation by another member of the same public defender's office that previously had represented a victim and key prosecution witness, and stating that "[c]onflicts can . . . arise from successive representation, particularly when a substantial relationship exists between the cases, such that the 'factual contexts of the two representations are similar or related'" but noting that "[t]he Supreme Court . . . has left open the question whether conflicts in successive representation that affect an attorney's performance require a showing of prejudice for reversal" (citation omitted)).

evidence that trial counsel had an actual conflict that adversely affected his performance." In particular, Rowland criticizes Pierpoint's statement that Detective Singleton and his partner Detective Dirickson "are highly credible, honest, hard working, diligent police officers. And I urge you to believe everything they said."

However, when read in context, this statement does not show that Pierpoint was adversely affected by his relationship with Detective Singleton. Pierpoint's praise was directed more at Detective Dirickson, and only mentioned Detective Singleton in passing. And, Pierpoint's praise of Detective Dirickson was part of his attempt to cast doubt on Lanet's credibility, and thus on Rowland's confession and the physical evidence she provided. Therefore, the California Supreme Court could conclude that Pierpoint's praise of Detective Dirickson (and by association Detective Singleton) was a reasonable tactical choice to attack the State's case.[5]

Accordingly, under AEDPA's highly deferential standard, the California Supreme Court reasonably rejected

---

[5] This case is not affected by our recent decision in *United States v. Walter-Eze*, 869 F.3d 891 (9th Cir. 2017). That case "[a]ssum[ed] without deciding that *Sullivan*'s rule of presumed prejudice as a matter of law can extend to a case of a pecuniary conflict" and held that even though there was an actual conflict, "under the facts presented, *Sullivan* does not control this case" and there was not a presumption of prejudice because, unlike with joint representation, "the actual conflict [was] relegated to a single moment of the representation and resulted in a single identifiable decision that adversely affected the defendant[.]" *Id*. at 900, 906. In contrast, this case does not involve an alleged pecuniary conflict or an "actual conflict."

Rowland's conflict of interest claim, and we affirm the district court's denial of habeas relief.**[6]**

## E.  Uncertified Issue

Finally, we deny a COA on the one uncertified issue Rowland raises on appeal.  Rowland argues that systemic delay in the administration of California's death penalty renders any ensuing executions arbitrary, and thus in violation of the Eighth Amendment, which is known as a "*Jones* claim."  *See Jones v. Chappell*, 31 F. Supp. 3d 1050 (C.D. Cal. 2014), *rev'd sub nom. Jones v. Davis*, 806 F.3d 538 (9th Cir. 2015).

This claim is unexhausted.  Rowland argues that his failure to exhaust should be excused because raising the claim in state court would be futile.  However, as Rowland acknowledges, we rejected the same argument in *Alfaro v. Johnson*, 862 F.3d 1176, 1180–83 (9th Cir. 2017).**[7]**

---

**[6]** In his reply brief, Rowland argues for the first time that "[e]ven if none of the foregoing errors by itself warrants relief, the cumulative errors do."  Rowland has waived this argument by not raising it in his opening brief.  *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).  Moreover, there is no cumulative error which warrants reversal.

**[7]** There may be some tension in our case law regarding whether exhaustion of a *Lackey* claim—which asserts that delay in a defendant's individual case between judgment and execution constitutes an Eighth Amendment violation, *see Lackey v. Texas*, 514 U.S. 1045 (1997) (Stevens, J., mem. op. respecting denial of cert.)—also serves to exhaust a *Jones* claim.  *Compare Alfaro*, 862 F.3d at 1184 ("The key distinguishing factor between *Lackey* and *Jones* claims is that the latter concern *systemic* delay that creates arbitrariness in executions.") *and Jones*, 806 F.3d at 554 (Watford, J., concurring) ("Presenting the *Lackey* claim to the California Supreme Court . . . did not satisfy the exhaustion requirement.") *with Andrews v. Davis*, 866 F.3d 994, 1039 (9th Cir.

Accordingly, we decline to expand Rowland's COA.

**AFFIRMED**.

2017) (holding that the petitioner's reference to *Jones* on appeal did not fundamentally alter his *Lackey* claim, and therefore exhaustion of his *Lackey* claim "likewise exhausted his current challenge"). However, any tension is not implicated here as Rowland did not raise a *Lackey* claim in either state or federal court.